**TIME WARNER CABLE OF NEW YORK CITY, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P., Paragon Communications d/b/a Time Warner Cable of New York City, Queens Inner Unity Cable Systems d/b/a Quics and TWC Cable Partners d/b/a Staten Island Cable, Plaintiffs,**

v.

**CITY OF NEW YORK, Defendant,**

**Bloomberg, L.P., Intervenor–Defendant.**

**No. 96 CIV. 7736 (DLC).**

United States District Court,
S.D. New York.

Nov. 6, 1996.

Stuart W. Gold, Robert D. Joffe, Rory O. Millson, Rowan D. Wilson, Christopher P. Bogart, Cravath, Swaine & Moore, New York City, for Plaintiffs.

Paul A. Crotty, Lorna B. Goodman, David B. Goldin, Corporation Counsel for the City of New York, New York City, for Defendant City of New York.

Martin Garbus, Maura Wogan, Edward H. Rosenthal, Edward Hernstadt, Frankfurt, Garbus, Klein & Selz, P.C., New York City, for Intervenor–Defendant Bloomberg L.P.

I. Background ...................................................... 1364
II. Facts ............................................................ 1366

 A. History and Statutory Structure of Federal Cable Law ..................... 1366
 1. The Cable Communications Policy Act of 1984 ........................ 1367
 a. Statutory Provisions ......................................... 1367
 b. A History of PEG ............................................ 1368
 c. Legislative History of the Cable Act ............................ 1368
 2. Post–1984 Cable Act Legislation ...................................... 1370
 3. Other Uses of "Educational" in Telecommunications Law .............. 1371
 B. "Public," "Educational," and "Governmental" in Practice: Nationally and in New York City ..................................................... 1371
 1. PEG Nationally ..................................................... 1371
 2. The History of Educational and Governmental Channels in New York City ............................................................... 1372
 3. Current Use of Educational and Governmental Channels: Crosswalks .... 1373
 C. Time Warner's New York Cable Systems .................................. 1374
 D. Franchise Agreements Between Time Warner and the City Regarding PEG ................................................................... 1375
 E. Facts Underlying the Current Dispute ................................... 1376
 1. Time Warner's Merger and Application to the City in Connection with the Merger ........................................................ 1376
 2. DoITT and Time Warner Worked Together in the Ensuing Weeks .... 1377
 3. Time Warner's Choice of MSNBC ...................................... 1377
 4. The City's Reaction to Time Warner's Rejection of Fox ................. 1379
 5. The Aftermath of Time Warner's Refusal to Carry Fox News .......... 1381
 6. Summary of Factual Conclusions ..................................... 1383
III. Discussion ................................................................. 1384
 A. Preliminary Injunction Standard ........................................ 1384
 B. The City's Actions Violate the Cable Act ................................ 1385
 1. The City's Actions Are at Odds With the Broad Purposes of PEG and the Structure of the Cable Act ....................................... 1385
 2. The City's Actions Violate the Governmental Use Provision of Section 531(a) ............................................................. 1386
 3. The City's Actions Violate the Franchise Agreements ................. 1389
 4. The City's Actions Violate Section 544(f)(1) ........................... 1391
 C. The City's Actions Violate Time Warner's First Amendment Rights ......... 1391
 1. First Amendment Jurisprudence ...................................... 1391
 2. Applying the First Amendment ....................................... 1394
 a. Time Warner's First Amendment Rights in the PEG Channels ....... 1394
 b. Time Warner's First Amendment Rights in the Commercial Channels ................................................... 1396
 i. Irreparable Harm ......................................... 1396
 ii. Likelihood of Success ..................................... 1399
 (a) Level of Scrutiny ....................................... 1399
 (b) Applying Strict Scrutiny ................................. 1401
IV. Conclusion ................................................................ 1403

---

### OPINION

COTE, District Judge:

This case concerns the power of a city to influence, control, and even coerce the programming decisions of an operator of a cable television system. It therefore goes to the heart of First Amendment concerns.

The pivotal event in this case occurred on October 1, 1996. On that date, the City of New York ("City") proposed to Time Warner Entertainment Company, L.P. ("Time Warner")[1]—a group of cable operators that provide cable service pursuant to franchise agreements with the City—a plan that called

---

**1.** I refer to the various related entities that are plaintiffs in this action as "Time Warner." These entities include Time Warner Cable of New York City, an unincorporated division of Time Warner Entertainment Company, L.P., that operates cable systems in New York City pursuant to franchise agreements with the City dated 1983 and 1990. Plaintiffs also include Paragon Communications, an individual franchisee that operates a cable system pursuant to the 1990 franchise agreement with the City, and Queens Inner Unity Cable Systems and TWC Cable Partners, which both operate cable systems pursuant to the 1983 franchise agreement.

for the City to abandon one of its cable channels designated for public, educational and governmental use ("PEG") if Time Warner would place the new Fox News program on one of Time Warner's commercial cable channels. Time Warner refused to "swap" channels with the City in order to accommodate Fox News. Unwilling to accept Time Warner's decision, a decision protected by the First Amendment and a federal statute, the City raised the ante over the ensuing days in an effort to convince Time Warner to change its mind. This campaign culminated on October 10, 1996, when the City placed Bloomberg Information Television ("BIT") on one of its PEG channels—specifically, a channel set aside for educational or governmental use—and prepared to place Fox News on another PEG channel. This action, intended to compel Time Warner to capitulate, instead has brought the parties before this Court.

So long as there remains a limitation on the number of cable channels, and intense competition over access to this valuable resource, there is a potential for a dispute of this nature to arise. Fortunately, however, the exercise of government power at issue here is without precedent. Given the irregularity of the City's actions in this case, I need not definitively decide each of the difficult issues, including a fine determination about the appropriate use of PEG channels under the Cable Communications Policy Act of 1984 ("Cable Act"). Pub.L. No. 98–549, 98 Stat. 2779 (codified at 47 U.S.C. § 521 *et seq.*). Nonetheless, I do find that the City's actions are far beyond acceptable PEG use, that the City acted in contravention of the legislative purposes of the Cable Act, and, specifically, violated the provisions relating to PEG use and the editorial autonomy of a cable operator. Most importantly, I find that by engaging in an effort to compel Time Warner to alter its constitutionally-protected editorial decision not to carry Fox News, the City has violated Time Warner's First Amendment rights.

## I. *Background*

Time Warner brought this action for preliminary injunction against the City on October 10, 1996. Defendant City is a municipal corporation organized under the laws of the State of New York. Defendant-intervenor Bloomberg L.P. ("Bloomberg") intervened in the action on October 16, 1996. Bloomberg is a news service that specializes in covering financial news and produces BIT.

Time Warner's complaint alleges that the City's actions violate the franchise agreements, the Cable Act, and the First Amendment. The complaint also alleges that if the City's actions are allowed under the Cable Act, then the Act violates the First Amendment as applied. Finally, the complaint alleges that the City's actions violate the Takings Clause of the Fifth Amendment, New York State law, the New York State Constitution, and the New York City Charter.

On October 11, 1996, this Court held a hearing on Time Warner's application for a temporary restraining order ("TRO") enjoining the City from continuing to show BIT and from placing Fox News on the Crosswalks Network ("Crosswalks"), a group of cable channels set aside for educational and governmental use and supervised by the City. After hearing the parties, this Court granted Time Warner's motion for a TRO.[2] A hearing on Time Warner's application for a preliminary injunction was set for October 23, 1996, and at the City's request an extension was subsequently granted to October 28. The parties agreed, pursuant to this Court's rules, to have the direct testimony of all witnesses presented by affidavit. Prior to the hearing, the parties were to designate which witnesses they wished to cross-examine in person.

Time Warner submitted affidavits from Richard Aurelio, President of New York City Cable Group[3]; Allan J. Arffa, outside coun-

---

**2.** While Bloomberg was not a formal party at the time of the TRO hearing, the Court heard argument from Bloomberg's counsel, and Jonathan Fram, Bloomberg's general manager of television news, was the only witness called at the TRO hearing.

**3.** Mr. Aurelio's affidavit was submitted in connection with Time Warner's request for a TRO. He also submitted a supplemental affidavit in connection with the request for a preliminary injunction.

sel to Time Warner; Fred Dressler, Senior Vice President of Programming at Time Warner Cable; Spencer B. Hays, Vice President and Deputy General Counsel of Time Warner; Robert S. Jacobs, General Counsel of Time Warner's New York City Cable Group; Stuart J. Lipson, an independent consultant specializing in developing competitive strategies, particularly in the cable industry; Gary McBride, President and CEO of GEMS International Television; Gregory Moore, Executive Director of Northwest Community Television; George William Nichols, President and CEO of Kaleidoscope Network, Inc.; Richard D. Parsons, President of Time Warner; Barry Rosenblum, President of Time Warner Cable of New York City; George C. Stoney, professor of film and television at NYU; and Lynn Yaeger, Senior Vice President of Corporate Affairs for Time Warner Cable.

Time Warner submitted deposition excerpts from Allan Arffa; Richard Aurelio; Walter de la Cruz, Director of Cable Television Franchises and Policy at the City Department of Information Technology and Telecommunications ("DoITT"); Fred Dressler; Barry R. Forbes, Executive Director of the Alliance for Community Media; James Honiotes, Vice President of Distribution for Jones Education Company, the producer of Knowledge TV; Robert S. Jacobs; David B. Klasfeld, Chief of Staff to Fran Reiter; Gary S. Lutzker, Telecommunications Counsel at DoITT; Randy Mastro, Deputy Mayor for Operations; Gary McBride; John T. McCormick, Assistant Commissioner of DoITT; Gregory Moore; Craig Muraskin, Special Assistant to Fran Reiter; George William Nichols; Alex Quinn, Executive Director and President of Manhattan Neighborhood Network; Bruce Regal, an attorney in the New York City Law Department; Elaine S. Reiss, General Counsel of DoITT; Fran Reiter,

Deputy Mayor for Economic Development and Planning; Ted Turner, Vice Chairman of Time Warner; Salvador C. Uy, former Assistant Commissioner for Cable Television and Telecommunications Policy for DoITT; and Lynn Yaeger.

The City submitted affidavits or affirmations from Paul A. Crotty, Corporation Counsel for the City; David B. Klasfeld; Craig Muraskin; Burt Neuborne, professor of constitutional law at NYU[4]; Elaine S. Reiss; Fran Reiter; and Salvador C. Uy. The City submitted deposition excerpts from Richard Aurelio, Walter de la Cruz, Fred Dressler, Spencer B. Hays, Robert S. Jacobs, Gary S. Lutzker, Randy Mastro, John T. McCormick, Craig Muraskin, Bruce Regal, Elaine Reiss, Fran Reiter, Barry Rosenblum, Ted Turner, Salvador C. Uy, and Lynn Yaeger.

Bloomberg submitted affidavits from Michael R. Bloomberg, President of Bloomberg L.P.; Leon Friedman, constitutional law professor at Hofstra Law School[5]; Joseph D. LaRocco, Television and Cable Services Manager for television station KACT in Aurora, Colorado[6]; Michael I. Meyerson, communications law professor at the University of Baltimore School of Law[7]; and Dean Smits, Director of the Office of Telecommunications for the City and County of Denver, Colorado. Bloomberg submitted deposition excerpts from Richard Aurelio, Walter de la Cruz, Fred Dressler, Barry Forbes, James Honiotes, Robert S. Jacobs, David B. Klasfeld, Gary S. Lutzker, Gary McBride, John T. McCormick, Gregory Moore, George William Nichols, Elaine S. Reiss, Bruce Regal, Barry Rosenblum, Dean Smits, Ted Turner, and Lynn Yaeger.

The Court received several *amicus curiae* briefs. The following organizations and individuals submitted briefs which were support-

---

**4.** Because the legal discussion contained in Professor Neuborne's affidavit was more appropriate for a legal brief, the Court allowed the City to resubmit Professor Neuborne's affidavit as an amicus brief.

**5.** As with Professor Neuborne's affidavit, Professor Friedman's affidavit was converted to an *amicus* brief for consideration by the Court.

**6.** On October 27, 1996, Bloomberg requested that the Court accept a supplemental affidavit from Mr. Larocco. The Court declined to do so, since the submission of all evidence in chief was to be made—with one exception allowing the City to take an additional deposition—on October 23, 1996.

**7.** Bloomberg redacted Professor Meyerson's affidavit to make it admissible.

ive—though not always entirely—of Time Warner's position: Cablevision of New York City; Mark Green, Public Advocate of the City of New York, Ruth Messinger, Manhattan Borough President, and Fernando Ferrer, Bronx Borough President; Media Access New York ("MANY"); National Cable Satellite Corporation ("C–SPAN"); and National Cable Television Association, Inc. ("NCTA"). Fox News Network submitted a brief supportive of the City's position. The Alliance for Community Media [8] and the New York Civil Liberties Union filed briefs which were supportive in some respects of the positions of Time Warner, the City, and Bloomberg.

The hearing on the preliminary injunction took place from October 28 to 30, 1996. The parties chose not to call any witnesses for cross examination. Based on the testimony and the exhibits admitted into evidence, I make the following findings of fact and conclusions of law.

## II. *Facts*

### A. *History and Statutory Structure of Federal Cable Law*

Cable television systems were first built in the late 1940s to carry broadcast television signals to remote or mountainous areas. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, ——, 114 S.Ct. 2445, 2451, 129 L.Ed.2d 497 (1994). The intent of these systems—called community antenna television (CATV) systems—was to extend the range of television services, not compete with them. *Id.* By the 1970s, however, cable television systems began developing and carrying their own programming in addition to broadcast channels. H.R.Rep. No. 98–934, at 20–21 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4658.

In contrast to broadcast television, which relies on electromagnetic signals transmitted from a central antenna and received by individual antennas in consumers' homes, cable systems rely on a physical connection: a signal is carried through a conventional or optical fiber cable that functions much like a telephone line. *Time Warner Entertain-*

*ment Co. v. FCC*, 93 F.3d 957, 962 (D.C.Cir. 1996). Indeed, cable television lines must be laid in the ground and attached to poles in the same manner as telephone lines. To lay these cables, operators must obtain rights-of-way and easements from local governments. *Id.* at 962.

As a result of these physical exigencies, cable television is regulated at the local level. Operators negotiate franchise agreements with local governments—"franchising authorities" in the telecommunications lexicon—to obtain the rights-of-way necessary to lay the cable wires. H.R.Rep. No. 98–934 *supra*, at 19, *reprinted in* 1984 U.S.C.C.A.N. at 4656. While the regulatory landscape of the cable industry changed with the advent of federal legislation in 1984—amended by two subsequent acts in 1992 and 1996—local franchise agreements still determine much of the delivery of cable services, subject to these federal laws which define and limit local governments' authority. *Id.* at 19, *reprinted in* 1984 U.S.C.C.A.N. at 4656.

Currently, the industry is comprised of cable operators, who own the physical assets and franchises and transmit the signals, and cable programmers, who produce programs and sell them to the operators. Operators and programmers often have ownership interests in the other and are thus "vertically integrated" entities. *Time Warner*, 93 F.3d at 963. A cable operator offers programming that is made up of local and distant television broadcast signals, along with local, regional and national cable channels (such as CNN, ESPN, and the Weather Channel). Cable operators contract with each cable programmer individually.

Cable programmers earn money by selling advertising space on their programs and charging cable operators a set fee per subscriber, per month. Not all programs function this way: some do not sell advertising (such as HBO and C–SPAN) and some do not charge on a per subscriber, per month basis (such as the TV Food Network). Cable operators earn money by collecting fees from subscribers. Cable operators attempt to

---

**8.** The Alliance for Community Media submitted an affidavit and a declaration from Barry R. Forbes, its Executive Director. The affidavit was received in evidence and the parties were given an opportunity to depose Forbes.

provide a selection of programs that will be attractive to subscribers.

### 1. The Cable Communications Policy Act of 1984

The Cable Act establishes national policy for the federal, state, and local regulation of the cable industry. The stated purposes of the law include the establishment of franchise procedures and standards to encourage the growth and development of cable systems and to assure that cable systems are responsive to the needs and interests of the local community, 47 U.S.C. § 521(2); the establishment of guidelines for the exercise of federal, state, and local authority with respect to the regulation of cable systems, 47 U.S.C. § 521(3); and the assurance that cable systems will provide the widest possible diversity of information sources and services to the public, 47 U.S.C. § 521(4).

#### a. Statutory Provisions

The Cable Act establishes who, in addition to the operator, may have access to a cable system. To assure a cable system provides programming that is responsive to the needs of the local community, the Cable Act authorizes franchising authorities to require operators to set aside an undetermined number of channels for "public, educational and governmental use." 47 U.S.C. § 531(a). These stations are known as PEG channels or PEG access. The statutory provision does not further explain this use, but Congress's meaning and intent is apparent from the legislative history of the Cable Act, discussed below. Importantly, the statute does not require cable operators to carry such channels. Indeed, as of 1990, only sixteen percent of all cable systems nationwide had public access, thirteen percent had educational access, and eleven percent had governmental access.[9] The Cable Act does, however, give a franchising authority the power to require an operator to provide PEG channels. A franchise agreement gives life to Section 531(a), but Section 531(a) also establishes a framework for these franchise agreements: that the channels be set aside for public, educational, and governmental use.

Another provision makes clear that a different group of voices will be heard. Section 532 requires an operator with more than 36 channels (including PEG channels, but excluding the local commercial television stations that a cable operator must provide to subscribers pursuant to a 1992 amendment codified at 47 U.S.C. § 534) to set aside a percentage of those channels for use by entities unaffiliated with the operator.[10] 47 U.S.C. § 532. The stated purpose of this provision is to "assure that the widest possible diversity of information sources are made available to the public." 47 U.S.C. § 532(a). Under this provision, a cable programmer can "lease" a cable channel from a cable operator. While the Act terms this access "commercial use," 47 U.S.C. § 532, and it is popularly referred to as "leased access," the "commercial" in the statute refers to the nature of the lease, not the content of the programming or intent of the programmer. Section 532(b)(5) states that "the term 'commercial use' means the provision of video programming, whether or not for profit." Indeed, a nonprofit entity may lease a channel under this provision. 47 U.S.C. § 532(b)(5)(B).

The statute also safeguards the editorial autonomy of operators, programmers, and PEG users. The programming decisions of cable operators are protected under 47 U.S.C. § 544(f)(1), which provides that "[a]ny federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." Likewise, a cable operator has no editorial control over PEG channels pursuant to 47 U.S.C. § 531(e), which states that "a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to [the PEG provision]." Under 47

---

**9.** Patricia Aufderheide, *Cable Television and the Public Interest*, 42 J. of Comm. 52, 58 (1992) (citing *Television and Cable Factbook, 1990* C–384 (1990)).

**10.** For Time Warner's cable system in New York City, a system which offers 76–77 channels depending on the borough, Time Warner must set aside fifteen percent of the channels on the system. 47 U.S.C. § 532(b)(1)(B).

U.S.C. § 532(c)(2) a cable operator "shall not exercise any editorial control over any video programming offered" under leased access.

### b. A History of PEG

The PEG provisions of the Cable Act did not introduce a new practice to the cable industry. Since the 1960s local governments had conditioned franchise grants on the provision of PEG access. This was done in an effort to "create a more direct right of access to the video media." Daniel L. Brenner et al., *Cable Television and Other Nonbroadcast Video: Law and Policy* § 6.04[1], at 6–34 (1996). Communities saw cable as "the next public forum," akin to "public parks, libraries, theaters, and other public fora [that] ... encourage, or at least permit speech." *Id.* New York City has required PEG channels on cable systems since 1971. *Id.* § 6.04[2], at 6–34.1.

Nor was the Cable Act the first time the federal government regulated PEG practices. In 1968, the Federal Communications Commission ("FCC") initiated rule-making proceedings that ultimately led to cable regulations adopted in 1972. James N. Horwood, *Public, Educational, and Governmental Access on Cable Television: A Model to Assure Reasonable Access to the Information Superhighway for All People in Fulfillment of the First Amendment Guarantee of Free Speech*, 25 Seton Hall L.Rev. 1413, 1414 (1995). These regulations, among other provisions, required cable operators in the largest 100 markets to set aside three channels for free use by public, educational, and governmental bodies. *Cable Television Report and Order*, 36 F.C.C.2d 143, 190–91, *aff'd on recon.*, 36 F.C.C.2d 326 (1972). In introducing the regulations, the FCC stated that the "fundamental goals of a national communications structure" would be furthered with the

> opening of new outlets for local expression, the promotion of diversity in television programming, the advancement of educational and instructional television, and increased informational services of local governments.

*Id.* at 190.

The regulations described "public" as an access channel "available without charge on a first-come, first-served nondiscriminatory ba-

sis." *Id.* The FCC defined "educational" as a channel that "local educational authorities" have access to for "instructional programming and other educational purposes." *Id.* at 191. The regulation stated that "the potential uses of the educational channel are varied. An important benefit promises to be greater community involvement in school affairs." *Id.* Finally, the FCC defined "governmental" as an access channel "designed to give maximum latitude for use by local governments." *Id.* The regulations were not long-lived, however, because the Supreme Court ultimately found them to be outside the scope of the FCC's delegated authority under the Communications Act of 1934 (which established the FCC and defined the scope of its regulatory authority). *FCC v. Midwest Video Corp.*, 440 U.S. 689, 708–09, 99 S.Ct. 1435, 1445–46, 59 L.Ed.2d 692 (1979).

Despite the rise and fall of federal regulations, the practice of including PEG channels in franchise agreements continued. The Cable Act, then, was intended to "recognize[ ] and endorse[ ] the preexisting practice of local franchise authorities conditioning their cable franchises on the granting of PEG channel access." *Time Warner*, 93 F.3d at 972. *See also* H.R.Rep. No. 98–934, *supra*, at 30, *reprinted in* 1984 U.S.C.C.A.N. at 4667. As explained by the D.C. Circuit, the PEG provisions merely ensure that states will not prohibit the practice, and preclude federal preemption challenges to such requirements. *Time Warner*, 93 F.3d at 972–73.

### c. Legislative History of the Cable Act

While the legislative history of the Cable Act is not abundant—a House Report and few Senate floor statements—the House Report addressed many of the issues in this case. The House Report stated that one goal of the law was to "provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas." H.R.Rep. No. 98–934, *supra*, at 19, *reprinted in* 1984 U.S.C.C.A.N. at 4656. The House Report stated that

[c]able television offers the public an abundance of channels, with the potential to present a wide variety of perspectives from many different types of program providers. Local governments, schools systems, and community groups, for instance, will have ample opportunity to reach the public under [the Act's] grant of authority to cities to require public, educational, and governmental (PEG) access channels.

*Id.* The House Report noted that leased access also would promote a diversity of views. *Id.* at 20, *reprinted in* 1984 U.S.C.C.A.N. at 4657.

In a section describing the PEG provisions, the House Report noted that

[o]ne of the greatest challenges over the years in establishing communications policy has been assuring access to the electronic media by people other than the licensees or owners of those media. The development of cable television, with its abundance of channels, can provide the public and program providers the meaningful access that, up until now, has been difficult to obtain.

*Id.* at 30, *reprinted in* 1984 U.S.C.C.A.N. at 4667. The section also stated that

[a]lmost all recent franchise agreements provide for access by local governments, schools, and non-profit and community groups over [PEG] channels. Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas. PEG channels also contribute to an informed citizenry by bringing local schools into the home, and by showing the public local government at work.

*Id.* While the House Report did not expand on the three prongs of PEG, a 1991 Senate Report leading up to the 1992 amendments of the Cable Act discussed the different types of use. The Senate Report concluded that public access would allow "individuals and groups to communicate their message to the general public;" educational access would allow "local schools to supplement classroom learning and to reach out to teach those who are beyond school age or unable to attend classes;" and the governmental channel would allow "for a local 'mini–C–SPAN.'" S.Rep. No. 102–92, at 52–53 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1185–86.

While the PEG channels were not an innovation of the Cable Act, Congress did create a new type of access through the leased access provision. The House Report stated that leased access

complements PEG access by assuring that sufficient channels are available for commercial program suppliers with program services which compete with existing cable offerings, or which are otherwise not offered by the cable operator (for political reasons, for instance).

H.R.Rep. No. 98–934, *supra,* at 30, *reprinted in* 1984 U.S.C.C.A.N. at 4667. The House Report made clear that the key to leased access was not the commercial nature of the programming or the producer, instead it was the commercial aspect of the lease: a programmer buys space on this channel, as opposed to the free access available under PEG. The House Report stated that

"commercial use" means the provision of video programming, whether or not the third party providing the program service is a profit or nonprofit entity. The term commercial use is employed to distinguish from public access uses which are generally afforded free to the access user, whereas third party leased access envisioned by this section will result from a commercial arrangement between the cable operator and the programmer with respect to the rates, terms and conditions of the access use.

*Id.* at 48, *reprinted in* 1984 U.S.C.C.A.N. at 4685.

In addition to striking a balance between types of access for third parties—PEG and leased—the Cable Act also sought to protect the First Amendment rights of each type of user, as well as the cable operator. The House Report acknowledged that access provisions can raise First Amendment concerns, but contended that these provisions "estab-

lish a form of content-neutral structural regulation which will foster the availability of a 'diversity of viewpoints.'" *Id.* at 31, *reprinted in* 1984 U.S.C.C.A.N. at 4668. The House Report also noted that the PEG and leased access provisions would not restrain a cable operator to a great degree since a

> local cable company may provide information in which it has a financial or proprietary interest on the vast majority of its channels, as long as it sets limited channel capacity aside for use by others.

*Id.* at 33, *reprinted in* 1984 U.S.C.C.A.N. at 4670. The House Report added to, and reiterated, this point:

> [t]he access channel requirements of [the Cable Act] are narrowly drawn *structural* regulations that will ensure a diversity of information sources without governmental intrusion into the content of programming carried on the cable system.

*Id.* at 35, *reprinted in* 1984 U.S.C.C.A.N. at 4672 (emphasis in original).

The House Report then addressed each constituency's concerns. Addressing PEG access, the House Report stated

> it is integral to the concept of the use of PEG channels that such use be free from any editorial control or supervision by the cable operator. . . . There is no limitation imposed on a franchising authority's or other governmental entity's editorial control over or use of channel capacity set-aside for governmental purposes. However, the Committee does not intend that franchising authorities lease governmental channels to third parties for uses unrelated to the provision of governmental access. . . .

*Id.* at 47, *reprinted in* 1984 U.S.C.C.A.N. at 4684.

Protecting the cable operators' First Amendment rights, the House Report stated

> [w]ith regard to the access requirement, cable operators act as a conduit. They do not exercise their editorial discretion over the programming; nor are they prevented or chilled in any way from presenting their own views and programming on the vast majority of channels otherwise available to them.

*Id.* at 35, *reprinted in* 1984 U.S.C.C.A.N. at 4672.

Later statements by Congress also evidence an intent to curb franchising authorities' control over cable operators. In the 1992 amendments to the Cable Act, Congress found that "[t]he Cable Communications Policy Act of 1984, in its amendments to the Communications Act of 1934, limited the regulatory authority of franchising authorities over cable operators." Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, § 2(a)(20), 106 Stat. 1460, 1463 (1992) ("1992 Act").

### 2. *Post–1984 Cable Act Legislation*

The cable industry grew dramatically after the 1984 Cable Act. Congress conducted a two-year study of the expanding industry which ultimately led to the passage of the 1992 Act. *Time Warner*, 93 F.3d at 963. The 1992 Act revised some provisions of the 1984 Cable Act, left others intact, and added still others. In response to congressional studies that concluded cable rates were excessive due to a lack of competition, the 1992 Act granted the FCC and local authorities the power to regulate prices. Primarily, the 1992 Act imposed rate regulations on the industry and required operators to carry television broadcast stations.

While the 1992 Act did not amend the 1984 Cable Act PEG provisions, it did add several provisions related to PEG. First, it required that cable operators provide a basic tier service, a set of channels that include PEG channels. 47 U.S.C. § 543(b)(7)(A)(ii). Second, it allowed franchise authorities to require cable operators to provide "adequate assurance that the cable operator will provide adequate public, education, and governmental access channel capacity, facilities, or financial support." 47 U.S.C. § 541(a)(4). Finally, the 1992 Act enacted censorship provisions for indecent programming on PEG channels. 47 U.S.C. §§ 532(h), (j), and note following § 531. This was a major change from previous law which prohibited cable operators from exercising any editorial control over PEG channels. The Supreme Court recently struck down the censorship provisions on First Amendment grounds.

*Denver Area Educ. Telecomm. Consortium v. FCC*, — U.S. —, —, 116 S.Ct. 2374, 2394, 135 L.Ed.2d 888 (1996).

The 1992 Act also made changes to the leased access provision. Section 612 of the Act notes that leased access is rarely used. While the reasons for this are uncertain, *Time Warner* 93 F.3d at 968–69, the Senate Commerce, Science, and Transportation Committee attributed the lack of use to the fact that cable operators could set the terms and rates of the leases. Sen.R. No. 102–92, *supra,* at 30–32, *reprinted in* 1992 U.S.C.C.A.N. at 1163–65. The 1992 Act allows the FCC to establish maximum rates for leased access and regulate the terms and conditions of such leases. 47 U.S.C. § 532(c)(4)(A). The 1992 Act also adds to 47 U.S.C. § 532 (the leased access provision) by providing that a cable operator may designate leased access channels for qualified minority or educational programming. The 1992 Act defines educational programming as "programming that promotes public understanding of mathematics, the sciences, the humanities, and the arts." 47 U.S.C. § 532(i)(3).

One study that informed the 1992 Act discussed the importance of localism "as a fundamental policy in domestic broadcasting." Dep't of Commerce, Nat'l Telecomm. & Info.Admin., Comprehensive Study on the Globalization of Mass Media Firms, 55 Fed. Reg. 5792, 5800 (Feb. 16, 1990). It stated that

> [w]hile this federal policy of "localism" is principally a part of broadcast regulation, cable television systems often have local programming requirements imposed on them pursuant to state or local franchises. The [Cable] Act authorized local franchising authorities to insert public, educational, or governmental access channel requirements in cable television franchises. Many local authorities have opted to establish such requirements. These access channels often provide programming to cable subscribers with a uniquely local orientation.

*Id.* at 5801 (footnote omitted).

Most recently, Congress enacted the Telecommunications Act of 1996 ("1996 Act"), Pub.L. No. 104–104, 110 Stat. 56, which de-regulates the cable industry, phasing out by March 31, 1999, the rate requirements imposed by the 1992 Act. 47 U.S.C. § 543(c)(3). In legislative debates leading up to the 1996 Act, a 1994 Senate committee report stated that PEG channels play an important role in cable services. It noted that

> [e]xisting telecommunication technologies have already permitted the development of diverse community-based programming that has increased civic discourse and expanded access and services to informational, cultural, educational, and health related services. For instance, community use of public, educational, and governmental (PEG) access channels on cable systems has become a vital means of maintaining an informed and involved citizenry. Community use of PEG access channels has increased dramatically over the past 20 years. Over 20,000 hours of new programs are now produced each week, totalling over 1 million hours of new programs per year. This is greater than ABC, CBS, NBC, and PBS combined.

S.Rep. No. 103–367, 103d Cong., 2d Sess. 15 (1994).

### 3. *Other Uses of "Educational" in Telecommunications Law*

Wireless cable systems, which transmit television signals over microwave bands and are only accessible to persons with specialized antennas and converters, do not fall within the ambit of the cable regulatory scheme. The FCC does, however, grant licenses for Instructional Television Fixed Service (ITFS) stations for use on these systems. These stations provide "educational, instructional, and cultural material to students participating in training programs and other educational television systems." 47 C.F.R. § 74.931(a)–(d) (1993). Only educational institutions and nonprofit organizations with educational purposes are eligible for ITFS licenses. *Id.* § 74.932.

### B. *"Public," "Educational," and "Governmental" in Practice: Nationally and in New York City*

#### 1. *PEG Nationally*

While PEG use varies somewhat around the country, typically, the channels are used

for similar purposes and in similar ways.[11] Public channels are available to individuals and community groups on a first-come, first-served basis. Wally Mueller, *Controversial Programming on Cable Television's Public Access Channels: The Limits of Government Response*, 38 DePaul L.Rev. 1051, 1060 (1989). These individuals or groups are producers, directors, writers, and actors. Robert S. Oringel & Sue M. Buske, *The Access Manager's Handbook: A Guide for Managing Community Television* 10–11 (1987).[12] This results in eclectic programming limited only by the users' imagination and innovation.

Educational institutions use the educational channels to extend classrooms into individual homes, reaching those who might not otherwise be able to attend classes. The channels are also used by educational institutions to disseminate news and information about school events. For instance, programming may inform the community about school news, update teacher training, publicize the school lunch menu, relay athletic event information, and provide instructional programming. *Id.* at 8, 11, 93. Municipalities use their governmental channels to disseminate information about governmental activities and to cover local government proceedings. *Id.* at 114.

There is some variation in the use of governmental and educational channels. For example, Aurora, a Denver suburb, airs local news on its governmental channel, many cities air programming for the disabled, and still others air foreign-language programming. These uses, however, arise from a determination that commercial television neglects the needs of certain audiences. The Aurora experience is instructive. In that case, the Aurora City Council decided that local news, which originates in Denver, did not adequately meet the needs of Aurora residents. Therefore, Aurora carries local news programming that does cover news from its community. Other cities reached similar conclusions about the need for foreign-language programming and programming focused on the needs of the disabled community. Although some of these programs contain commercials, to the knowledge of this Court, no city uses its PEG channels to compete with regular commercial channels. Rather, PEG programming that varies from a more traditional use stems from a desire to serve those communities that are not otherwise served, not a desire to enter the commercial fray of cable programming.

2. *The History of Educational and Governmental Channels in New York City* [13]

New York City broke the path for PEG access, negotiating for municipal channels almost since the beginning of cable services in the City. Cable franchises awarded in 1970 provided for two "City Channels." *See, e.g.,* Contract Between City of New York and Sterling Information Services, Ltd. (Aug. 18, 1970) at §§ 1(n), 4(b). Amendments to these franchise agreements four years later increased the number of City Channels to four. *See, e.g.,* Contract Between City of New York and Teleprompter Corp. (Feb. 28, 1974) at 5. Only two of the channels were used—one for educational programming and the other for

---

**11.** This "typical use" is reflected in a pre-Cable Act case where a United States District Court in Rhode Island discussed a franchise agreement that required the operator to provide PEG channels. The court defined "public" as those channels "available for use by members of the general public on a first-come, first-served nondiscriminatory basis"; "educational" as channels "available for use by local educational authorities and institutions (including but not limited to school departments, colleges and universities but excluding commercial educational enterprises)"; and "government" as channels "available for use by municipal and state government." *Berkshire Cablevision of Rhode Island v. Burke*, 571 F.Supp. 976, 980 (D.R.I.1983), *vacated as moot*, 773 F.2d 382 (1st Cir.1985).

**12.** The assertions contained in this book were largely confirmed by the information the parties gave this Court at the preliminary injunction hearing.

**13.** Although the Court asked the parties on October 15, 1996 to provide it with as much information as possible regarding the historical and current use of PEG channels in New York City (and across the country), the City did not submit any information regarding the use of the City's PEG channels on October 23, 1996, the day the evidence in chief was submitted by each party.

governmental programming such as the broadcasting of City Council meetings. By the early 1980s, the government channel had become "a forum for City officials, municipal agencies, non-profit organizations and community boards to speak directly to New York citizens." Manhattan Cable TV, *Community Programming Handbook* 7 (1982). The types of programs run on the government channel included "East Side Report" hosted by two assemblymen, "Community Board 3," and "Social Security and You," a call-in program where callers posed and received answers to their questions about social security. *See id.* at 7. In the late 1980s the location of the channel was relocated (from Channel L to Channel 25), but the use remained the same, offering such programs as call-in shows where participants debated policy issues with public officials. *Id.*

### 3. *Current Use of Educational and Governmental Channels: Crosswalks*

In February 1992, the City launched Crosswalks. This network is owned and operated by the City of New York and is administered by DoITT. The network operates five channels (numbers 71–75) which are available to all cable subscribers. Crosswalks reaches four million viewers in 1.4 million households. When the City launched the network, the Commissioner of the Department of Telecommunications and Energy ("DTE"), William F. Squadron, stated that the goal of Crosswalks was to "use the cable technology to bring educational, governmental, and public information to the people." William F. Squadron, *New York City's Cable Television Network: Statement by the Commissioner.* He said Crosswalks would have

> programs devoted to enhancing the quality of life for young people and for senior citizens. It will have job training shows and employment listings. It will offer public safety tips on subjects like crime and fire prevention. It will provide health information to help people identify and respond to illness. It will display a bulletin board of government, educational, and cultural activities throughout New York. And, in time, it will cablecast the proceedings of the City Council and the City Planning Commission.

*Id.* He stated that Crosswalks was "not a commercial enterprise" and viewers "should not expect glossy network productions." *Id.* Another stated goal was to "realize the potential of [cable] to improve communication between government and the public." *Id.*

The initial 1992 Programming Policy and Operational Procedures for Crosswalks identified the goals of Crosswalks: to (1) "enhance public awareness and understanding of the structure and functions of City government services, resources, and activities"; (2) "increase access to City government for the City's residential and business communities"; (3) "provide various educational services to the City's diverse communities"; and (4) "disseminate information about the services and programs provided by City agencies and other government offices." Crosswalks Television Network, Dep't of Telecomm. & Energy, *Programming Policy & Operational Procedures* 1 (1992).

Crosswalks' 1995 Policies and Procedures manual states that Crosswalks produces its own programs and co-produces programs with other government agencies. The guidelines state that programs may come from non-governmental agencies but only if "endorsed by a government agency and in connection with programs containing subject matter directly or indirectly related to the functions of such agency." Crosswalks Television Network, Dep't of Info.Tech. & Telecomm., *Policies and Procedures* 9 (1995).

When first launched, the DTE said that each of the five Crosswalks channels would have a distinct character. The different identities would be (1) public interest—consumer-oriented information about government requirements such as building permits; cultural programs; and public safety; (2) government in action—government proceedings such as City Council and City Planning Commission; (3) adult education and training—offering basic adult education, English language classes, and a bulletin board for jobs and training programs; (4) youth—programming by and for children; and (5) health, science, and the environment—programs about community and personal health, and alternative energy sources.

Current Crosswalks programming mirrors these categories. A June 1, 1995 DoITT manual for Crosswalks describes the programming on the five Crosswalks channels. For example, Channel 71 shows Off–Track Betting ("OTB") and program listings. Channel 72, called the "Opportunity Channel," airs educational and employment-oriented programs such as English and Spanish GED classes, other basic skills programs, and job listings. Channel 73 lists announcements of government services, hotline numbers, cultural and educational activities around the City, and a number of ethnic programs. Channel 74 is called "A Window Into Government." Among other things, it telecasts City Council meetings, programs about health and safety, taxes, and senior citizens. Channel 75 is known as "CUNY–TV" and is funded and operated by the City University of New York. It carries educational programming such as "Multiculturalism: Cross Cultural Communication"; "Algebra: Exponents and Radicals"; and "The Chinese: Overview of Chinese History."

Channel 74, the "Window Into Government," is of particular importance to this case. As one of the proposed homes for Fox News, Channel 74 has several self-proclaimed goals: (1) to "serve as a window into the workings of government"; (2) to serve as a medium for expression and debate of public issues"; (3) to "give prominence to information, ideas and viewpoints that might not otherwise be seen or heard"; and (4) to "build constituency support and recognition among city officials, community groups and the public at large."

DoITT's 1995 annual report touts Crosswalks' achievements. It notes that

[f]or over three years, Crosswalks has been enhancing public awareness of government activities and services via non-commercial, non-partisan, municipal pro-

gramming, while providing literacy and employment training for adults.

Dep't of Info. Tech. & Telecomm., *Annual Report FY 1995,* at 29. Crosswalks' Mission Statement describes its mission as one to "provide educational programming and to enhance public awareness of government activities and services through its five basic cable channels via strictly non-commercial and non-partisan television."

Crosswalks did not air commercial programming until July 1996. At that time the City asked Time Warner for permission to use a government channel for advertiser-supported foreign language and ethnic programming. These programs had lost their space on WNYC, a public television station, when the City sold that station. At the City's request, Time Warner agreed to waive its right to block such programming.

## C. *Time Warner's New York Cable Systems*

Time Warner runs two cable systems in New York City, with 77 channels in Manhattan, and 76 in the outer boroughs. On both systems, nine stations are set aside for PEG use and eleven for leased access. In addition, the Manhattan and Staten Island systems air fifteen local broadcast stations, pursuant to the federal must-carry law,[14] and the Brooklyn and Queens systems air fourteen such stations. Therefore, Time Warner has programming control over forty-one to forty-three stations, depending on the borough. Of the nine PEG channels in Manhattan, four are designated for public access use and are administered by the Manhattan Neighborhood Network, a non-profit entity independent of the City. These stations are not at issue in this controversy. The remaining five channels represent the "EG" in PEG and are administered by a City agency.

---

**14.** Qualifying local television stations may choose between two types of access to a cable system. They may either elect for carriage under the "must-carry" provision of the 1992 Act which does not require a contract, or they may negotiate a contract for carriage under a "retransmission consent." *See* 47 U.S.C. § 534(b); 47 C.F.R. § 76.64 (1995). Of the fifteen local televi-

sion stations carried on Time Warner in Manhattan and Staten Island, nine are carried pursuant to the must-carry provision and six pursuant to retransmission consent contracts. On the Brooklyn and Queens systems, eight stations are carried pursuant to must-carry and six pursuant to retransmission consent contracts.

### D. *Franchise Agreements Between Time Warner and the City Regarding PEG*

There are two franchise agreements relevant to this case, both of which are still in effect: a 1983 franchise agreement ("1983 Agreement") between New York City and Time Warner for the provision of cable services in Brooklyn, Queens, and Staten Island, and a 1990 franchise agreement ("1990 Agreement") between the City and Time Warner to provide cable services to northern and southern Manhattan.

Both agreements provide for PEG channels. The 1983 Agreement states that the "Municipal Channels" will be used "for the purpose of distributing noncommercial services by the City or for any other lawful governmental purpose." 1983 Agreement § 4.1.03. The 1990 Agreement states that the "Governmental Channels" will be

> used for distributing Services by the City or educational institutions for functions or projects related to governmental or educational purposes, including the generation of revenues by activities reasonably related to such uses and purposes.

1990 Agreement § 4.1.04. Both agreements state that the parties cannot amend the agreements except in writing. 1983 Agreement § 20.3; 1990 Agreement § 16.22. Both agreements also contain merger clauses. 1983 Agreement § 20.3; 1990 Agreement § 16.4.

The differences in language between the agreements regarding the PEG stations has generated much discussion. The City maintains that the omission of the word "noncommercial" in the 1990 Agreement entitles it to place commercial programs on the channels. Time Warner uses parol evidence to demonstrate the parties' intent in the 1990 Agreement. When negotiating the 1990 Agreement, the City proposed language regarding the "use of Governmental Channels" that would have opened the door for commercial programming. The proposed language read

> [t]he Governmental Channels shall be placed under the jurisdiction of the Mayor and used for any lawful purpose including, without limitation, any revenue generating use.

Time Warner rejected this language and proposed that the provision be consistent with the 1983 Agreement. Time Warner also submitted written comments responding to the City's proposal and explaining Time Warner's proposed changes. In these comments, Time Warner stated that the provision had been "[m]odified to conform more closely to the [1983 Agreement].... In particular, such channels should not be used for commercial purposes." Time Warner took this position because it believed noncommercial programming was mandated by the law. The City's lawyers, including its cable expert Norman Sinel, an author of a treatise on cable law, also took the position that noncommercial programming on PEG stations was mandated by the law. Both parties thus agreed that any commercial programming would be unlawful. The final version of the 1990 Agreement does not mention whether the channels may be used for commercial purposes, or are restricted to noncommercial purposes, but does limit the use of the channels to "governmental or educational purposes." 1990 Agreement § 4.1.04.

The City never aired commercial programming on the PEG channels under either agreement until July 1996. Between the signing of the 1990 Agreement and this dispute, the City has refused to air at least two programs with a strong public interest character specifically because of their commercial nature. First, in early 1995, GEMS, a Spanish-language cable programming network which offered educational, cultural and entertainment programming that emphasized Latina issues, was rejected for carriage on Crosswalks because GEMS was an advertiser-supported program.

Second, in 1995, Kaleidoscope Network, Inc., a for-profit cable programmer that provided programs by, for, and about the disabled community, met with the City about placing its programs on Crosswalks. In these meetings the general manager of Crosswalks expressed concern about Kaleidoscope's commercial nature, in particular that the network aired commercials and was a for-profit entity. The City apparently never made a final decision on whether to carry

the Kaleidoscope network, but there have been no recent discussions.

In support of its position, the City cites a number of examples of commercial programming prior to October 1996. For example, the City refers to the airing of Off–Track Betting programming. This program was designed to generate revenue for the City by promoting betting through the OTB. Moreover, it was carried with Time Warner's express consent. The City also refers to a promotional program provided by Microsoft that gave instructions on the usage of Microsoft products, with the incidental effect of promoting those products. I find the difference between such programming and the programming at issue here too great to place any weight on the prior action of the City in these circumstances or to change my conclusion that the City believed the franchise agreements prevented commercial programming, including Fox News.

### E. Facts Underlying the Current Dispute

1. Time Warner's Merger and Application to the City in Connection with the Merger

On September 22, 1995, the Board of Directors of Time Warner Inc., the corporate parent of the franchisees, and the Board of Directors of Turner Broadcasting System, Inc. ("Turner") approved the terms of an agreement providing for a merger involving the two companies.

On May 30, 1996, Richard Aurelio, the President of Time Warner's New York City Cable Group, wrote to inform DoITT of the merger and Time Warner's view that the transaction involved no change of control of the franchisees or Time Warner, and, therefore, required no action on the City's part. Under Time Warner's franchise agreements with the City, Time Warner must seek the City's approval of any change of control, which is defined as "actual working control," of the franchisees or their franchises. There is a rebuttable presumption that a change in ownership exceeding five percent of a franchisee constitutes a change in control. The

franchise agreements also prohibit anticompetitive behavior, and allow the City to investigate and rectify such a situation. 1983 Agreement §§ 3.8.01–02; 1990 Agreement §§ 3.8.01–07. Over the years, the City has taken the position that a restructuring constitutes a change of control, but has in each instance approved the change provided the franchisees agreed to certain conditions.

At a meeting on July 8, 1996, DoITT asked Time Warner to submit a formal petition requesting a ruling from the City that the merger did not constitute a change of control. In response, Time Warner submitted such a petition on July 22, 1996. The petition requested the City to act by the end of August since the parties anticipated closing the transaction in September. The petition revealed that a change of ownership of five percent or more of Time Warner was being proposed, but argued that because the current franchisees and their existing management would remain in control of the franchises, and the actual working control of the franchisees would remain unchanged, that the change in ownership did not result in any change of control for purposes of the franchise agreements. The petition set out in detail the terms of the proposed transaction, including the fact that Ted Turner, the President and Chairman of Turner Broadcasting, was expected to receive approximately 11.3% of the shares of Time Warner, representing approximately eleven percent of the voting power; that he would be elected to the Time Warner Board of Directors as Vice–Chair, and would be permitted to nominate one additional director to the fifteen-member board. Ten of the fifteen board members would continue to be unaffiliated, outside directors.

On July 30, 1996, DoITT's Assistant Commissioner Salvador Uy wrote that the City believed that the proposed transaction did involve a change in control requiring City approval. However, based on the review done so far, DoITT believed that it "may be possible for DoITT to recommend approval of the merger to the City's Franchise and Concession Review Committee" ("FCRC") [15]

---

**15.** The FCRC consists of the Mayor or his designee, who acts as its chair; the Director of the

Office of Management and Budget; the Corporation Counsel; the Comptroller; an additional

and that the City would do everything possible to accommodate Time Warner's stated time frames. DoITT committed to work towards a schedule that would permit it to make a presentation to FCRC at its September meeting. It asked to see the final agreement Time Warner had negotiated with the Federal Trade Commission ("FTC") and a draft of the proxy statement that would be distributed to the shareholders.

### 2. DoITT and Time Warner Worked Together in the Ensuing Weeks.

At a meeting on August 16, 1996, Time Warner and its counsel gave DoITT a detailed explanation of the merger and responded to DoITT's questions. This meeting was attended by, among others, the City's outside counsel and expert on cable matters, Norman Sinel. There was no discussion about the diversity of programming on Time Warner. On August 20, Uy prepared a draft memorandum to the FCRC requesting approval of the merger. The draft memorandum requested that a public hearing be held by the FCRC on September 9, 1996 and that the Committee consider an attached proposed resolution at its meeting of September 11, 1996. The proposed resolution approved the merger, provided that executed copies of merger documents that had been seen in draft were submitted and that the franchisees pay the costs of the review of the petition. As was customary, DoITT sent the draft memorandum and proposed resolution to Time Warner and thereafter assured Time Warner that its requested changes would be incorporated into the final resolutions.

Due to a delay in the FTC approval process, the merger was not placed on the FCRC's September 11 agenda. On September 12, 1996, Time Warner announced that the FTC had approved Time Warner's merger with Turner. Time Warner immediately advised the City that the closing date for the merger was set for October 10. DoITT assured Time Warner on several occasions that there should be no difficulty in approving the merger before the October 10 closing date.

DoITT's review process for the merger was essentially completed by mid-September.

On October 1, 1996, after a meeting described in some detail below, DoITT's General Counsel Elaine Reiss called Aurelio to discuss preparations for the October 9 FCRC meeting, at which it was expected that the merger would be approved. That day she sent Aurelio a draft of the resolution and memorandum that DoITT planned to send to the FCRC. The memorandum requested a public hearing on October 7 and Committee approval on October 9. The proposed resolution was substantially unchanged from the August 20 draft. Reiss also enclosed a memorandum with a list of the remaining outstanding issues, which would be discussed with Time Warner at a meeting on October 3. None of those issues related to Fox News or any other news programming. Through this time, there had been no mention of any news programming issue or Fox News in the discussions between DoITT and Time Warner concerning the FCRC approval of the merger.

At a meeting on October 3 between DoITT and Time Warner, all but three of the outstanding issues were resolved. After the remaining issues were resolved in a telephone conversation between Reiss and Aurelio later that day, it appeared that there were no other obstacles that would prevent FCRC approval of the merger. At about this time, when Aurelio raised with Uy the need for a special meeting of the FCRC to approve the merger, Uy assured Aurelio that a special meeting was unnecessary and that everything was proceeding on track.

### 3. Time Warner's Choice of MSNBC

As a prerequisite to approving the merger, the FTC issued a consent decree that required Time Warner to carry on cable systems serving a specified number of subscribers one additional 24–hour news channel unaffiliated with either Time Warner or Turner. The consent decree did not require

person appointed by the Mayor; and the borough president of the borough in which the franchise under review is located. Any approval of a resolution regarding a franchise requires an affirma-

tive vote of at least four members; if more than one borough is involved, the borough presidents jointly may exercise one vote.

that a new news service be carried in New York City, but only that one be made available to fifty percent of Time Warner subscribers across the nation by July 2001. In anticipation that the consent decree would contain a provision of this nature, Time Warner had already entered into negotiations with Fox News and MSNBC, a joint venture between Microsoft and NBC, each of which had announced an intention to launch a full-time, all-news cable programming network. Bloomberg, another news provider, also approached Time Warner about carriage pursuant to the consent decree.

Fox News is ultimately owned by Rupert Murdoch, the CEO of News Corporation, a multinational network of companies. Murdoch's holdings in New York City include *The New York Post* and WNYW–Channel 5. Murdoch also owns the Fox Broadcast Network. In Great Britain he owns, among other things, *The Times, The Sun* and SkyTV. In Australia he owns newspapers and a national television network.

Fox News is a 24–hour news channel that was launched on October 7, 1996, and was described at that time as being available to 17 million cable television subscribers. In June 1996, the City and News America Publishing, the parent company of the Fox News Channel, had concluded negotiations which, according to the City, provide for the retention of 2,212 jobs and the creation of a projected 1,475 jobs. As part of the agreement, new studios for Fox News were to be located in midtown Manhattan. The City reports that it is projected that over 513 of the new jobs attributable to News America would be created through the operation of the Fox News channel.

MSNBC planned to convert an existing cable programming service, the America's Talking service, to an all-news format. America's Talking was already being distributed to approximately 20 million cable subscribers, of whom about 3 million were Time Warner subscribers.

Bloomberg operates a television news service that was created from the services provided by the Bloomberg terminal, a desktop provider of financial news and information.

A ticker tape of current market and financial information important to investors appears on the television screen at all times during Bloomberg television programming.

Bloomberg provides 24–hour news programming to approximately 2.5 million subscribers through direct to home satellite service. Approximately 10 million additional cable television subscribers receive Bloomberg coverage on a part-time basis. Bloomberg also has affiliation agreements with commercial independent television broadcast stations, which permit it to reach about 47 million households. Bloomberg seeks distribution on commercial channels and to raise revenue through the sale of advertising and subscriber payments. In New York City, Bloomberg is carried 24 hours a day on a Time Warner commercial network sold to hotels, restaurants and office buildings. Bloomberg has also provided twenty daily six-minute customized regional reports for Time Warner's cable systems in New York City. Bloomberg sells up to 90 seconds of advertising during each of these six-minute segments. When BIT was shown on the Crosswalks channel, it was these six minute segments that were inserted to fill the fourteen minutes per hour in which advertising is normally seen.

Time Warner did not consider BIT a serious contender to satisfy the requirements of the FTC consent decree. In contrast, MSNBC and Fox News were each viable candidates. From Time Warner's perspective, MSNBC presented several advantages over Fox News. First, NBC had a reputation in the delivery of news built over decades of work in the field, while Fox had no established national television news organization. Second, conversion of America's Talking would give MSNBC immediate access to all of those subscribers without the need to enter into new contracts with cable operators. Third, an agreement with MSNBC resolved several outstanding commercial disputes between NBC and Time Warner without the need for litigation.

A principal disadvantage of choosing Fox News was that Fox wanted immediate carriage on substantially all of Time Warner's

systems, which, because of channel capacity limitations in many of those systems, would have required deletion of other programming services. Time Warner was reluctant to delete programming because of, among other things, concerns about the reaction of viewers who are loyal to programming that is displaced. Time Warner wanted a slower and smaller roll-out for Fox News.

On July 15, 1996, NBC converted America's Talking to MSNBC and Time Warner carried MSNBC on the channels that had been showing America's Talking despite the fact that they had not reached any agreement to do so. By the end of August 1996, Time Warner informed Fox that it did not want to continue negotiations until after satisfactory conclusion of the FTC process. At that point in time, Time Warner and Fox were close to reaching an agreement, but still had to resolve some important issues, such as an assurance from Fox that its programming on its news network and its broadcast network would not be duplicative.

On September 17, Time Warner notified Rupert Murdoch, Fox's CEO, that it had chosen MSNBC over Fox.

The addition of MSNBC to the New York City cable system meant that Time Warner now carried eight full-time cable news channels, which, when combined with the news programs provided by the broadcast networks and other cable networks, provide more than 350 hours of news and information programming to New York City cable subscribers each day.

In addition to BIT and Fox News, approximately thirty programmers have sought unsuccessfully to be carried full time on Time Warner's cable systems in New York City. They include: The Independent Film Channel, Sports Illustrated/CNN, America's Health Network, TV Land, Turner Classic Movies, ESPN 3, The Travel Channel, and Mind Extension University. Some of these thirty services are run by New York City based companies such as Viacom, CBS/Westinghouse, Capital Cities/ABC, and Hearst.

4. *The City's Reaction to Time Warner's Rejection of Fox*

On September 20, 1996, three days after Murdoch learned of the Time Warner deci-

sion to conclude an agreement with MSNBC, the Mayor called Deputy Mayor Reiter and reported that Roger Ailes (the President of Fox and a former media advisor to the Mayor) had called to say that Fox had run into a problem getting onto the Time Warner cable system in New York City. The Mayor said the situation "was very serious" and asked Reiter to investigate.

On September 26, Reiter and Corporation Counsel Paul Crotty met with Fox representatives and were told that Fox viewed the issue as an antitrust problem. At Crotty's invitation, Fox outlined its antitrust theory in a letter to Reiter dated September 27. The letter indicated that "carriage of Fox News Channel on New York City's cable systems was required to assure the necessary *financial and advertising success* and audience demographics of the Channel" (emphasis supplied). The letter represented that Time Warner's decision put Fox News Channel in danger of failing in this commercial endeavor. Fox indicated that it was considering filing comments with the FTC opposing the merger as anticompetitive, filing a lawsuit against Time Warner for violations of the antitrust laws, and submitting a petition to the City that the FCRC not approve the merger.

In response to the Mayor's request and the information she had learned from Fox, Reiter, in conjunction with her staff and counsel, conceived of the idea of using Crosswalks as a way to obtain access for Fox News to the New York City cable system. She understood that the shortage of capacity on Time Warner's system was responsible, at least in part, for its decision to not give Fox News a channel. On September 29, Reiter spoke with Time Warner's Derek Johnson to request a meeting with either Richard Parsons (President of Time Warner) or Gerald Levin (Chairman of Time Warner), prior to the October 7 FCRC public hearing on the merger, so that the City could discuss its concerns about Time Warner's decision not to carry Fox News. Johnson's internal memorandum to his colleagues regarding this telephone call notes that the proposal

"[a]lthough attractive ... could spark grave reaction from programmers and politicians alike."

The critical meeting in this series of events was held on October 1, 1996, in Reiter's office. Attending the meeting on behalf of the City were Deputy Mayor Reiter, her chief of staff David Klasfeld, a Special Assistant to Reiter and her designee as Chair of the FCRC Craig Muraskin, Assistant Corporation counsel Bruce Regal, outside counsel for the City Norman Sinel, and the General Counsel of DoITT Elaine Reiss. Robert Jacobs, General Counsel of Time Warner's New York City Cable Group, and Allan Arffa, outside counsel for Time Warner, accompanied Aurelio to the meeting. Most of the persons attending the meeting have put in affidavits and been deposed.

The purpose of the meeting was to convey the City's request that Time Warner agree to carry the Fox News Channel on Time Warner's commercial channels. Reiter indicated that the City wanted this issue resolved before the FCRC meeting to approve the merger. When Aurelio raised the issue of the legal prohibitions against the City's involvement with the content of cable programming on the commercial stations, Reiter asked Regal to describe the City's proposal in detail.

The proposal was that the City would allow Time Warner to move what the City termed an "educational" program—citing the Discovery Channel or the History Channel as examples—onto a Crosswalks channel, creating a vacated channel for Fox News on Time Warner's commercial system. Because of concern over the First Amendment issues that this proposal triggered, the City proposed a way to structure the transaction. Regal said that the parties could "paper the deal" to make it appear as if there were no quid pro quo, with "simultaneous closings" for the City's agreement to give up a municipal channel and Time Warner's agreement to carry Fox News. As Reiter has explained in her direct testimony, the City did not want to be in the position of having agreed to carry another channel and then learn that Time Warner had no intention of using the freed channel for Fox News.

Time Warner responded that the proposal was unacceptable; Arffa, outside counsel for Time Warner, described provisions of the Cable Act and its legislative history which prohibit the City from requiring specific programming to be carried by a cable operator. Sinel, outside counsel for the City and an authority on the Cable Act, indicated that the City was fully aware of the "risks" of the proposal and did not need a lecture about the law. As far as the City was concerned, the issue was whether Time Warner was as prepared to run the risks as the City was. The meeting quickly ended after Time Warner pointed out that there were other programmers who wanted to be placed on the commercial channels, many of them also based in New York, who would not be getting the special preference that the City was suggesting for Fox News. Aurelio had indicated during the meeting that the reason that Fox News and Time Warner had not reached an agreement was not simply capacity, since that was always a problem, but that there had been a failure to arrive at a business arrangement, and, although Time Warner was willing to resume negotiations, Fox had walked away.

In a telephone call he placed on the evening of October 1, Richard Parsons told Reiter that he thought the City's intercession on behalf of Fox News was inappropriate, but that he hoped that Time Warner and the City could avoid a head-on collision. In response to Reiter's indication that she understood Time Warner was willing to continue its negotiations with Fox News, Parsons indicated that Time Warner was not ready to renew those discussions until after the merger on October 10.

Reiter described the meeting earlier in the day as very unpleasant and unnecessary since the City recognized Time Warner's right to refuse to grant a waiver to allow Fox News to be placed on Crosswalks. In order to resolve the entire problem, she urged Parsons to have Time Warner's Levin call Murdoch and promise to meet soon with the goal of getting Fox News on the New York cable system. She argued that Fox News had to be put on the cable system so that 600 jobs could be saved. Parsons pointed out

that those jobs were assured since Fox News already anticipated a successful launch of its channel. Reiter then indicated that she would be sending a letter with a new idea that would permit Fox News to be put on Crosswalks with a waiver from Time Warner. When Parsons indicated that any resolution of the issue would have to follow the October 10 closing of the merger, Reiter pointed out that Fox News was going to raise the issue of its exclusion from a Time Warner channel in New York City at the FCRC public hearing and that that would be a problem for Time Warner. She also stated that the franchises were up for renewal in 1998 and Time Warner would not want the Fox News Channel issue to cloud the renewal decision.

On October 2, 1996, Reiter wrote to Time Warner requesting that Time Warner agree to a "waiver" to permit the City to place Fox News on Crosswalks. The City acknowledged that the franchise agreements provide for the use of Crosswalks "for governmental purposes." She identified those governmental purposes as responding to Fox's claim that it could no longer guarantee the creation of the new jobs it projected from the development of Fox News without a cable channel in New York City and the City's desire to have a diversity of news available to New Yorkers. The letter noted that Fox News would have to carry commercials in order to insure its fiscal viability. The letter ended with the statement:

> The City is fully aware of the first amendment and Federal law restrictions on its authority to regulate content on cable television systems. Nothing in this letter is intended in any way to be, and should not be construed as being, inconsistent with Time Warner's rights under the Constitution and Federal law.

On October 3, the Mayor requested a meeting to be held at Gracie Mansion on the current status of negotiations on the Fox News issue and the status of the Time Warner petition for approval of the merger. Reiter, Regal, Crotty, Muraskin, Klasfeld, Deputy Mayor Mastro, Sinel, and Reiss attended the meeting. Reiter told the Mayor that she was waiting for Time Warner's response to her new request for a waiver.

On October 3, Time Warner wrote to Reiter and rejected the request for a waiver.

5. *The Aftermath of Time Warner's Refusal to Carry Fox News*

As described above, at a meeting on October 3, 1996 between Time Warner and DoITT concerning the FCRC approval of the merger, there was no mention of Fox News or any specific programming matters. DoITT continued to convey that it would be recommending to the FCRC that the merger should be approved. It quickly became clear though that the City would hold the merger approval hostage to Time Warner agreeing to carry Fox News on a cable channel.

On October 3, Sinel called Arffa and told him for the first time that the City might raise antitrust issues in connection with the merger. On October 4, Klasfeld wrote Time Warner's Parsons and urged him to reconsider the rejection of the City's request that it waive its objection to Fox News being placed on Crosswalks through an appeal to Time Warner's "good corporate citizenship." Again, the City justified the waiver on grounds that it would help Fox News create 1,475 new jobs and enhance competition in news programming. The City cited as a precedent the waiver that had allowed ethnic programming formerly carried on WNYC–TV, a City-owned station, to continue on Crosswalks after WNYC–TV was sold.

On October 7, Time Warner refused to relent, contending that it was inappropriate for commercial programming like Fox News to be carried on a PEG channel. Time Warner responded to the appeal that it be a good corporate citizen by citing the many efforts it had made to be one, including its commitment to the City's economic revitalization. Time Warner indicated, however, that the City's effort to get its consent on the eve of the FCRC hearing was inappropriate and created the impression that the City was using its regulatory leverage to influence Time Warner's programming decisionmaking. As Time Warner explained, it had received more than thirty requests from cable programmers for carriage in New York City prior to receiving the Fox News request, and

many of these services were also based in New York City.

On that same day the Mayor received a letter from Bloomberg which offered to furnish BIT, stripped of its commercials, for carriage on Crosswalks. Also on October 7, the public hearing regarding the merger was held before the FCRC. A transcript of that hearing was received in evidence. Suffice it to say that Fox News objected to the FCRC approving the merger.

On October 8, Klasfeld told Muraskin that the FCRC should not act on Time Warner's petition at the October 9 meeting. Consequently, at the October 9 meeting of the FCRC, Muraskin read a lengthy statement from the Mayor, which indicated that the City had not yet had enough time to consider the merger issue and therefore consideration of the merger was deferred. Several of the facts described in the statement are at odds with the record developed for this hearing. In response to questions from those members of the FCRC who are not the Mayor's representatives, Muraskin indicated that DoITT itself had never been prepared to recommend the merger and that nothing had changed in DoITT's mind between October 2 and 9 except that additional questions prevented such a recommendation. That statement is not consistent with the evidence presented at the hearing. DoITT had received the information it requested from Time Warner, had satisfied itself that there was no obstacle to approval of the merger, and had been prepared to recommend approval until instructed by the Mayor's Office in early October that the approval would not be forthcoming at the October 9, 1996 meeting.

Following the FCRC meeting on October 9, Reiss, Muraskin, Regal, Sinel, and Klasfeld developed ideas to regularize the placement of commercial programming on Crosswalks. Reiss has characterized this as the Mayor's new initiative for fostering economic development and program diversity. As part of this initiative, DoITT was requested to start a review of Crosswalks' programming to determine which channels could be allocated for use by programmers excluded from Time Warner channels. In addition, the Corporation Counsel and DoITT were to work together to develop a set of procedures to govern selection of new vendors for Crosswalks. As Reiter has explained at her deposition in this action, the City attempted to put Fox News on Crosswalks to promote a diversity of ideas on television and to put different philosophies on cable.

Also on October 9, Time Warner received another written request from the City that Time Warner consent to the City's running Fox News and BIT with commercials on Crosswalks. Without such consent, the letter advised that the City intended to make available "for a limited period of time" its Crosswalks network for commercial-free carriage of these programs.

On October 10, Time Warner rejected the proposal in writing, pointing out that the removal of commercials could not sufficiently change the nature of the programming to make it suitable for a PEG channel, and that the entire effort violated Time Warner's rights under the Cable Act and the First Amendment, since it sought to interfere with the cable operator's programming decisions.

The reaction of the City was swift. At 10:48 p.m. the City began to transmit BIT over a Crosswalks channel without any further notice to Time Warner. The transmission included some advertising, which Bloomberg has since pledged to eliminate should the injunction be lifted. The City intended to begin transmitting Fox News on a Crosswalks channel at midnight on October 11, but was prevented from doing so by the issuance of the TRO.

Fox was displeased that the City planned to treat it and Bloomberg alike. In addition, it was displeased about going onto Crosswalks without commercials. It preferred to run its programming with commercials, but turn over the revenue to the City. To the City, however, at least before it submitted its brief in opposition to this motion, running the programming with commercials would have required it to get permission from Time Warner. Nonetheless, the City and Fox recognized that running Fox News commercial-free was, at best, a temporary arrangement, as reflected in Fox's letter to Klasfeld of October 10 which indicated that Fox would

not commit to providing its signal on a commercial free basis beyond December 31, 1996. The letter ended with the observation. "We certainly hope that well before that date Time Warner agrees to *fulfill its previous commitment* to carry [Fox News] on its system."

In defense of its action, the City represents that virtually all of the programming that would be replaced by Fox News and the Bloomberg service consists of repeat broadcasts of programs from the Opportunity Channel and the Electronic Bulletin Board that were aired earlier that day or week.

### 6. *Summary of Factual Conclusions*

The City argues that the evidence does not establish that it retaliated against Time Warner or engaged in a campaign to pressure Time Warner to agree to allow Fox News to be carried on one of Time Warner's cable channels. Instead, the City argues, the evidence indicates that it simply accepted Time Warner's decision on October 1 to reject the City's proposal regarding the channel swap, and that the City's actions after that point were not taken in response to what it admits was Time Warner's absolute right under both the Constitution and the Cable Act to reject the City's proposal. The City argues that it deferred a decision by the FCRC out of a legitimate concern that Time Warner had engaged in anticompetitive behavior, a concern justified by Time Warner's failure to address adequately the questions raised by Fox about Ted Turner's involvement in the Time Warner decision to choose MSNBC over Fox News. Moreover, the City argues that it planned to place Fox News on Crosswalks out of concern that a failure to do so would threaten, as the City put it at the time, the economic viability of Fox's entire expansion plan. Finally, it argues that it planned to place Fox News on a Crosswalks' channel out of a belief that New Yorkers needed more "diversity" in their news programming than is currently available to them.

I find that the evidence at the hearing establishes the following, when taken as a whole. In response to learning that it had not won the bidding battle with MSNBC,

Fox used its direct access to the Mayor to seek the City's assistance. The City, in a strategy developed and executed by the Mayor's senior staff, then undertook to convince and, if necessary, force Time Warner to place Fox News on one of Time Warner's commercial channels. Fox and the City understood and agreed that Fox News could not run on television for any significant length of time without commercials, and, therefore, it was essential that Time Warner be convinced to place Fox News on a commercial channel.

At first, the City proposed swapping one of the Crosswalks channels in order to get Fox News added to the Time Warner system of commercial channels. This proposal eliminated, from the City's standpoint, any claim by Time Warner that its reason for not adding Fox News was insufficient channel capacity. It also reflected, however, the depth of the City's commitment to Fox, since it contemplated that the City would cede authority over one of its PEG channels to a commercial programmer. To disguise as best it could its willingness to give up twenty percent of the channel capacity on its Crosswalks system— channels which were supposed to be dedicated to educational and governmental purposes, not competing commercial news programs—the City offered to swap a channel. That way, a program with a quasi-educational mission could be moved onto one of the Crosswalks channels. The City's proposal contemplated a violation of the Cable Act, including its anti-leasing provisions. As it acknowledged in the fateful meeting of October 1 at which it presented its proposal, there were risks that this proposal violated the law. As far as the City was concerned, the only issue was whether Time Warner was as prepared to run those risks as was the City.

At the meeting, and indeed even before the meeting, the City linked resolution of this issue with the upcoming FCRC review of the Time Warner merger. After the rejection of the City's proposal during the October 1 meeting, the City increased the pressure on Time Warner by linking Time Warner's satisfying Fox to the City's renewal of the franchises, which are due to expire in 1998.

The City's next proposal, that Time Warner grant a waiver and allow Fox News to be run on a Crosswalks channel designated "for governmental purposes," met with no more success than its proposal to swap a Crosswalks channel for a commercial channel. The City's plan to put Fox News on a PEG channel as a 24–hour commercial news program is without precedent. There is substantial evidence that the City understood that its proposal violated the Cable Act. It was certainly entirely at odds with the tradition of programming on PEG stations, both across the nation, and in New York City. It also violated the City's own procedures and guidelines for PEG programming, and, without Time Warner's consent, violated the franchise agreements as well.

When this second proposal was rejected, the City acted on its threat—held out since September 29—to hold hostage FCRC approval of the merger until Time Warner capitulated to the City's demands. The agency in charge of reviewing Time Warner's petition for approval of the merger had finished its substantive review and had assured Time Warner that it would be recommending approval of the merger. A decision was made at the Deputy Mayor level or higher on approximately October 3, however, that the merger would not be approved by the FCRC, a body controlled by the Mayor, without Time Warner consenting to let Fox News onto the cable system with commercials. Without FCRC approval of the merger prior to the closing on October 10, Time Warner was now vulnerable to a charge by the City that it had breached the franchise agreements.

Finally, the City took steps to put Fox News on Crosswalks, although stripped of its advertisements. Even in this format, however, the City was choosing programming for a PEG channel that had no precedent in the City or beyond and that was not contemplated by the Cable Act.

I also find that the City would not have chosen to place BIT on a PEG channel but for its decision to place Fox News on a PEG channel. Bloomberg's request to the City highlighted how selective the City was in its treatment of Fox News, and thus gave the

City no alternative but to accommodate Bloomberg. Bloomberg's request presented the City, however, with the opportunity of placing even more pressure on Time Warner. While Bloomberg expects significant advantages to accrue from any exposure in the New York market, it is Bloomberg's intention to enter the cable market in New York City on a commercial basis, that is, to make a profit by selling advertising and other commercial arrangements for its programming. It has no long-term interest in being on a noncommercial channel other than in gaining a foothold in the commercial market by developing viewer loyalty.

I find that Time Warner has established through compelling evidence that the City abused its power over the FCRC process and its control of the PEG programming on Crosswalks and has acted both to coerce Time Warner and to retaliate against it for its decision not to enter a contract with Fox News. The more difficult issue is whether such conduct provides a basis for continuation of the injunction. It is to that issue that I now turn.

### III. Discussion

#### A. Preliminary Injunction Standard

To obtain a preliminary injunction, Time Warner must demonstrate (1) that it would be irreparably harmed should the injunction not be granted, and (2) a likelihood that it will succeed on the merits of its claim. NAACP v. Town of East Haven, 70 F.3d 219, 223 (2d Cir.1995). In order to satisfy the irreparable harm requirement, "[a] moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by monetary damages." Id. at 224.

In an oft-cited opinion, the Third Circuit elaborated on the standard for irreparable harm in First Amendment cases.

It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." But the assertion of First Amendment rights does not automatically require a finding of irrepara-

ble injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. Rather the plaintiffs must show "a chilling effect on free expression." It is "purposeful unconstitutional [government] suppression of speech [which] constitutes irreparable harm for preliminary injunction purposes." Accordingly, it is the "direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury." Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.

*Hohe v. Casey,* 868 F.2d 69, 72–73 (3d Cir.) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976)) (other citations omitted), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989). *See also Bery v. City of New York,* 97 F.3d 689, 693–94 (2d Cir.1996); *Shea on Behalf of Am. Reporter v. Reno,* 930 F.Supp. 916, 935 (S.D.N.Y.1996), *petition for cert. filed,* 65 U.S.L.W. 3323 (U.S. Oct. 15, 1996) (No. 96–595).

■ For the second prong of the preliminary injunction standard, the Second Circuit has recently reaffirmed that in cases requiring an injunction against the government, the plaintiff must show likelihood of success:

> Ordinarily, the movant then has two options: it must either demonstrate a likelihood of success on the merits or it must raise "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." However, in a case in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.

*Bery,* 97 F.3d at 694 (citations omitted).

B. *The City's Actions Violate the Cable Act.*

A judgment of whether particular programming violates Section 531(a) must be grounded in an understanding of the structure of the Cable Act itself, the programming environment in which Congress imposed the regulatory structure, and the legislative history explaining the purposes and content of Section 531(a). The franchise agreements in this case are also relevant since they give life to, and, more importantly, evince the parties' understanding of, Section 531(a).

In the instant case, the City's contravention of the Cable Act is evidenced by its disregard of the broad purposes and structure of the Act, a violation of the specific "governmental use" provision of Section 531(a), a violation of the franchise agreements, and, finally, a violation of Section 544(f)(1). I will discuss each aspect in turn.

1. *The City's Actions Are at Odds With the Broad Purposes of PEG and the Structure of the Cable Act.*

Congress did not enact the Cable Act PEG provisions in a vacuum. The PEG provisions reflect an understanding of the industry standard and prior government regulation under the 1972 FCC regulations. Congress intended to codify this understanding by ensuring franchising authorities could continue to require cable operators to provide public channels for individual and community access, educational channels for educational institutions, and governmental channels to show local government at work. This congressional intent is confirmed by Justice Kennedy's conclusion in a recent Supreme Court case where he stated that

> Congress has not, in the [Cable] Act or since, defined what public, educational, or governmental access means or placed substantive limits on the types of programming on those channels. Those tasks are left to franchise agreements, *so long as the channels comport in some sense with the industry practice to which Congress referred in the statute.*

*Denver Area,* —— U.S. at ——, 116 S.Ct. at 2408 (Kennedy, J. concurring in part and dissenting in part) (emphasis supplied). While the industry standard may vary somewhat around the country, *see supra,* it certainly does not encompass PEG use whereby a city attempts to compete with a cable operator or even to provide programming essen-

tially identical in nature to that available on local commercial channels. Moreover, there is an industry standard in New York City. Since 1970 when it first began using PEG channels, New York City has used the "EG" channels to bring schools and government into the homes of the citizenry, facilitate better communication between educational and local governmental institutions and the public, and meet the needs of its citizens left unaddressed by commercial programming.

The Cable Act does not require PEG access nor establish the exact meaning of PEG, but it does set an outer limit to PEG. Section 531(a)'s phrase "public, educational or governmental use" is not without meaning. It establishes a limit on both the identity of the user and the content of the program. A franchise agreement gives life to this provision, but neither a franchise agreement, nor a party's actions, may violate the substantive meaning of Section 531(a). While it is unnecessary to determine the exact limits of governmental use—nor do I want to, given the importance of governmental flexibility in the face of changing technology and public needs—as explained below, it is clear that no matter what the contours of that line, the City may not use its channels as it intends here.

Further evidence that the City's action violates the Cable Act can be found in the overall structure of that Act. Both Fox News and Bloomberg had alternatives to a PEG station. In addition to continuing negotiations for carriage on Time Warner's regular channels, these programs could have applied for commercial space on a leased access channel, pursuant to Section 532.[16] That Section provides a remedy for this situation—where a cable operator refuses to carry a programmer for whatever reason—by ensuring that a rejected programmer may lease access on the cable system, without permission from the cable operator. The mere fact that this option is not immediately available to a programmer because the leased access channels are full does not sanction a city diverting PEG channels, which were de-

signed for a different type of use, to the needs of such commercial programmers. New York City cannot make an end-run around the congressional determination that leased access is the solution to this type of situation, not the use of channels allocated for public, educational, and governmental access.

2. *The City's Actions Violate the Governmental Use Provision of Section 531(a).*

The parties dispute the meaning of the term "governmental use" in the Cable Act. The City argues that the PEG provision sanctions any use by the government—if the actor is the government, the content of the program is irrelevant. The City argues that under Section 531(a) the requirement that a channel be reserved " 'for public, educational or governmental use' is automatically satisfied if the *user* is the City of New York, because the City is a government." (City Mem. at 16) (emphasis in original). Thus, it contends that it could, if it desired, run any commercial programming it wanted. Such a reading is at odds with both the language of the statute, the legislative history, the City's practice, and even the advice it received from its own legal counsel and cable law expert when it negotiated its franchise agreement with Time Warner. Time Warner argues that "governmental use" refers to the purpose of the channel: to provide programming related to governmental purposes.

I find the City's reasoning unpersuasive. I do not accept the City's reading of a portion of the legislative history. The City cites the following section of the House Report:

> it is integral to the concept of the use of PEG channels that such use be free from any editorial control or supervision by the cable operator.... There is no limitation imposed on a franchising authority's or other governmental entity's editorial control over or use of channel capacity set-

---

16. Moreover, to the extent a programmer believes Time Warner has excluded it from commercial channels in violation of the law, it, of course, has recourse to the legal system. And indeed, Fox has pursued this option. *See Fox News Network v. Time Warner Entertainment Co.,* No. 96–4963 (E.D.N.Y. filed Oct. 9, 1996).

aside for governmental purposes. However, the Committee does not intend that franchising authorities lease governmental channels to third parties for uses unrelated to the provision of governmental access. . . .

H.R.Rep. No. 98–934, *supra*, at 47, *reprinted in* U.S.C.C.A.N. at 4684. I do not find that this section supports a reading of the PEG provision that sanctions any use of a governmental channel so long as the user is the government. This section of the House Report is found in the "Section–by–Section" analysis of the Act. The disputed language is in reference to the editorial control of the government, not the overall purpose of PEG. The purposes of PEG are discussed in the beginning of the House Report, and thus govern any interpretation of a particular section. Indeed, the section that describes the purposes of PEG is amply clear on the appropriate content of such channels. The House Report states

[p]ublic access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas. PEG channels also contribute to an informed citizenry by bringing local schools into the home, and by showing the public local government at work.

*Id.* at 30, *reprinted in* U.S.C.C.A.N. at 4667. From this statement it is clear that the governmental use envisioned by Section 531(a) is the goal of "showing the public local government at work." To the extent the House Report addresses the identity of the user of the channel, it makes clear that the intended users are the public, and educational and governmental institutions, for their own purposes. It states that

[l]ocal governments, schools systems, and community groups, for instance, will have ample opportunity to reach the public under [the Act's] grant of authority to cities

to require public, educational, and governmental (PEG) access channels.

*Id.* at 19, *reprinted in* U.S.C.C.A.N. at 4656.

Moreover, if I were to follow the City's interpretation of the PEG provision, the entire statutory provision would be nonsensical. Channels for "public, educational, and governmental use" would have no meaning— instead, a franchising authority could require the cable operator to set aside channels for the government, and the government could do as it pleases with these channels, such as provide educational and public access. Indeed, the government could become a competitor with a cable operator for the provision of commercial programming instead of providing access for those voices who generally will not have commercial access: the public at-large, educational institutions, and government programs. Under the City's interpretation of the statute, not only would "public" and "educational" be subsumed under "governmental," any programming, so long as it is chosen by the government, would be acceptable. This not only renders Section 531(a) incoherent, it also obviates the need for the entire scheme of the Cable Act which creates three distinct types of programming: that chosen by the cable operator, that leased by other programmers, and PEG use. I certainly do not intend to handcuff the City's efforts to use the PEG channels in innovative ways that best serve the public, but I may not allow the City to use such a valuable resource in ways clearly unintended by the Cable Act.

To be clear, I am not determining whether a government can ever run "commercial" programming on a PEG station. I do not find that the Cable Act bans advertising on PEG stations. If a municipality determines advertising is useful to fund programming on local government at work or other appropriate PEG programming, I find nothing in the Cable Act that would prevent a municipality from doing so.

 The City's argument that Section 531(a) sanctions any use by the government is, in any event, substantially undermined by the fact that this is only the latest in a series of attempts by the City to justify its actions. Before filing its brief in opposition to the

preliminary injunction motion, the City never took this position. Indeed, the City's conduct over the years supports my reading of the Act—that the Act imposes some limits on governmental use. The City's actions, described in detail above, include its limited use of government channels, the waivers sought for commercial programming, the proposal to "paper the deal" with Fox and Time Warner, the admission that its proposal ran certain legal "risks" and, finally, the City's own shifting justifications for its action throughout this litigation.

These shifting justifications are powerful evidence that the City does not believe its own position. At the TRO hearing the City labelled Time Warner's challenge frivolous, asked this Court to look only at the content of the programming, and justified BIT as "educational." It contended that it had the right to run any news program as "educational" programming, so long as it did so without commercials. Now the City argues it may place Fox News on Crosswalks under a different PEG prong, that is, the "governmental" element of PEG, and, moreover, that it may run any program it wishes under that prong with commercials.[17]

Finally, and most significantly, I simply do not agree with the City's interpretation of Section 531(a). The City argues that Section 531(a) only prescribes the identity of the user and not the type of use because such a reading of the statute is content-neutral. The City argues that a court should presume that Congress would enact a content-neutral statute so as to avoid a violation of the Constitution and that any other interpretation risks a finding that the statute is not content neutral.[18] Therefore, the City argues that I should accept its reading of the statute.

I find the City's reasoning unpersuasive. While the statute refers only to "governmental use," the statute codified the idea that a governmental channel was to show "local government at work." H.R.Rep. 98–934, supra, at 30, reprinted in 1984 U.S.C.C.A.N. at 4667. Therefore, an interpretation which states that the Cable Act sanctions any use by the government belies the intent and purpose of Section 531(a). Even the phrasing used by Congress indicates that the grant of control over certain channels was so that they could be put to particular uses. If it had wished to identify only the user of the channels, Congress could have expressed that concept far more directly.

Nor does the classification scheme which I find Congress to have adopted mean that the statute is unconstitutional on its face. To the contrary, to interpret the "G" of PEG programming to require the programming to show local government at work runs no more risk of rendering the statute unconstitutional than interpreting the "G" to allow the government to televise anything it wishes. In either event, the government will be required to apply the statute in a manner consistent with the Constitution. *Time Warner*, 93 F.3d at 973.[19] Indeed, the unbridled discretion reflected in the City's definition carries with it the very risk that the government will abuse that discretion by selecting speakers, as it has here, without reference to the purposes of the Cable Act.

██ Applying Section 531(a) to the City's conduct here, I find that the City's decision to air a 24–hour news program, substantially identical in feed to that aired on commercial channels across the country, with the relatively minor exception of the inclusion of some minutes of local New York news, constitutes in the circumstances of this case a use of a PEG channel in a way clearly unin-

---

**17.** In closing arguments, the Corporation Counsel for the City continued to contend that the City has the right under both the 1984 Act and the franchise agreements to run Fox News and BIT on Crosswalks as 24–hour news programs with advertising, but that the City intends only to run them without advertising.

**18.** In a facial challenge to Section 531(a), in which Time Warner had the burden of proving that there is no set of circumstances under which

the Cable Act would be valid, the D.C. Circuit held that the provision is content neutral and thus constitutional. *Time Warner*, 93 F.3d at 971–73.

**19.** Because of the result achieved herein, I need not reach Time Warner's claim that the statute is unconstitutional as applied or decide whether Time Warner has standing to make that challenge.

tended by Congress. There are several underlying purposes to the PEG channels. These purposes include a desire to respond to local needs, create space for voices that would not otherwise be heard, air programs needed by a community that may not otherwise be commercially viable, and, for governmental channels, show local government at work. While a failure to serve any one of these purposes may not itself be dispositive, in the instant case, the City's use of Crosswalks is at odds with all four purposes.

First, neither Fox News·nor BIT responds to local needs. These 24–hour news programs are largely duplicative of programming already on commercial stations. New York City is not Aurora, Colorado. New York cable subscribers receive over 350 hours of national and local news and information programming a day.

Second, neither Fox News nor BIT will contribute a voice that is not already heard. While I make no judgments about their content, I find that these commercial news programs do not provide space for a class of speakers not already present on commercial stations.

Third, neither Fox News nor BIT needs a government subsidy in order to reach large audiences. These for-profit news programs are able to generate revenue through commercial advertising and contracts with cable operators, something a school that would use an educational channel, for example, is not able to do.

Finally, neither Fox News nor BIT will allow the citizenry to see local government at work, except in the most incidental fashion. A 24–hour news station may *report* on local

government, but the news program is not bringing local government into the homes of the public. Rather, to the extent it is covering local events, it is doing so in a manner no different from another commercial news program.[20]

Thus, wholly· apart from any examination of·the City's improper motives in giving Fox News and BIT the preferential treatment at issue here, it is apparent that the City violated Section 531(a) in placing and attempting to place these programs on Crosswalks. In sum, for the reasons discussed in this section, I do not find the City's interpretation—that the City does not violate the PEG provision when the user is the government, no matter what the use of the channel—persuasive. I find further, that by its actions, the City has violated Section 531(a).

3. *The City's Actions Violate the Franchise Agreements.*

■■■■ The parties dispute whether the franchise agreements permit the City to place Fox News and BIT on a government channel.[21] I find that the agreements do not permit such use, whether the programs are shown with or without commercials, absent written permission from Time Warner to do so. I reach this conclusion based on the language of the agreements, the extrinsic evidence surrounding the negotiation of the 1990 agreement which sheds light on the parties' intent in reaching those agreements, as well as the City's conduct under the agreements.

■■■■ The dispute centers on the word "commercial." I find that the parties understood this term to refer to the presence of

---

20. In its closing argument, Bloomberg proffered that it could, with little technical difficulty, create a news product different from that the City ran on October 10. This new product would incorporate, for some unspecified portion of each day, footage reflecting local government events in a portion of the screen directly across from that portion of the screen in which the news would be presented. This proposal is intended to bring BIT more in line with traditional PEG programming by incorporating coverage of local government at work. I refrain from further comment about whether this proposal, if presented on a record indicating that the City chose such programming for a reason consistent with

Section 531(a), would pass muster since I may not render an advisory opinion about a hypothetical set of facts not properly before me.

21. As this Court has informed the parties, a finding that the .City has breached the franchise agreements will not, by itself, support the issuance of a preliminary injunction. Nonetheless, the parties have spent considerable energy on the issue of breach because of its relevance to the claim that the City has violated the Cable Act and because of the light it sheds on the City's motivations in placing BIT and Fox News on Crosswalks. ·

commercials and whether the programmer is a for-profit company. The parties both argue that the language in the franchise agreements is unambiguous but offer competing interpretations of that "unambiguous" language. While existence of such a debate as to meaning does not create an ambiguity, I find nevertheless that the language is ambiguous, and therefore will rely on parol evidence not to vary or add to the terms of the contract, but only to interpret and give effect to the parties' intent. A court may do so, even if the contract contains a merger clause. *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 509–10 (2d Cir.1989). The parol evidence in this case persuades me that both franchise agreements contemplated only noncommercial uses for the PEG stations.

■ Even more persuasive, however, is the City's conduct up until October 1996. Such conduct is relevant to understanding the contract, even if the contract is unambiguous, which it is not. The Second Circuit has held that the "parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transport Line, Inc. v. American Philippine Fiber Indus.*, 743 F.2d 85, 91 (2nd Cir.1984). The City's actions, discussed above, reflect an understanding that the government was free to use its channels for noncommercial services only. Indeed, the Assistant Commissioner at DoITT testified that programming must be noncommercial to comply with Crosswalks' mission and objectives. Additionally, both agreements make clear that the stations are to be used for governmental purposes, and Fox News and BIT, as the City intends to run them, do not fall within the ambit of appropriate governmental purposes. I now address the commercial nature of the programming.

Fox News and BIT are commercial programming designed to compete in the commercial market and were not created for a PEG environment. The commercial nature of Fox News is evident from that programmer's negotiations with Time Warner where Fox News intended to be carried on Time Warner channels, complete with commercials. Moreover, everywhere else in the country Fox News is carried, it is aired with commercials. Indeed, one purpose in obtaining carriage was so it could be seen by advertising decisionmakers. I base these findings on the facts discussed above, most importantly the letter dated October 10 from Fox News to the City where Fox News agreed to run on Crosswalks without commercials only through December 31, 1996, and the letter dated October 2 from the City to Time Warner requesting a waiver for Fox stating that Fox News needed commercials to remain commercially viable. Moreover, the City's own justification for its actions— that the presence of Fox News retains and creates jobs—is only true to the extent Fox News is commercially profitable, a profit that will be based, in part, on its ability to sell advertising.

I need not determine the extent of BIT's commercial nature because in two instances Bloomberg has admitted to its commercial content and goal. First, in a letter from Bloomberg to Time Warner in early September 1996, it angled for carriage on the Time Warner system under the FTC consent decree. The intent of the letter appears to be to convince Time Warner that BIT would satisfy the requirement that Time Warner carry an "Independent Advertising–Supported News and Information Video Programming Service" under Time Warner's consent decree with the FTC. Bloomberg cannot have it both ways. It cannot try to convince Time Warner in September 1996 that it is commercial enough to count as competition under the consent decree and then in October 1996 argue it is not so commercial as to violate the franchise agreement. Second, at the TRO hearing Bloomberg's general manager of television news, Jonathan Fram, testified to this Court that Bloomberg's goal for being on Crosswalks was to enter the New York commercial market as a 24–hour news channel.

The City argues that stripping Fox News and BIT of their commercials transforms these programs into noncommercial offerings. I find this unpersuasive. Both Fox and Bloomberg are for-profit entities that plan to create a for-profit business in New York City. Even if they agree to forego commercials in the short-run, they cannot

and do not intend to do so for long. It is not their intent to stay on the PEG channels any longer than necessary. I find that both Bloomberg and Fox hope and expect that access to the New York market through Crosswalks will win for them the opportunity to run on the commercial channels in the near future.

Given the clear commercial intentions of Fox and the admissions by Bloomberg, I find these programs are commercial for the purposes of this dispute and therefore their placement on a governmental channel violates the franchise agreements.

### 4. *The City's Actions Violate Section 544(f)(1).*

█ The Cable Act protects the First Amendment rights of PEG users, leased access users, and cable operators. In this case, Time Warner alleges that the placement of Fox News and BIT on Crosswalks violates Time Warner's editorial autonomy under Section 544(f)(1). The analysis for such a violation is substantially the same as for a violation of the First Amendment and, therefore, I conclude for the same reasons discussed below, that the City's actions violate Section 544(f)(1) of the Cable Act.

### C. *The City's Actions Violate Time Warner's First Amendment Rights.*

#### 1. *First Amendment Jurisprudence*

█ The Supreme Court's First Amendment jurisprudence in the area of cable regulation is not well settled. It cannot be disputed, however, that "[c]able programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the

First Amendment." *Turner,* 512 U.S. at ——, 114 S.Ct. at 2456. The Supreme Court held that this is so because

> [t]hrough "original programming or by exercising editorial discretion over which stations or programs to include in its repertoire," cable programmers and operators "see[k] to communicate messages on a wide variety of topics and in a wide variety of formats."

*Id.* at ——, 114 S.Ct. at 2456 (quoting *Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986)).

In *Turner,* which involved a First Amendment challenge by cable operators and programmers to the "must-carry" provisions of the 1992 Cable Act, the Supreme Court addressed the appropriate level of scrutiny to apply to the regulation of cable operators. As an initial matter, the Court held that the relatively deferential standard that applies to the regulation of broadcast television was inappropriate for cable. *Id.* at ——, 114 S.Ct. at 2456. The Court noted that the "justification for our distinct approach to broadcast regulation rests upon the unique physical limitations of the broadcast medium," *id.* at ——, 114 S.Ct. at 2456, and held that "[t]he broadcast cases are inapposite in the present context because cable television does not suffer from the inherent limitations that characterize the broadcast medium." *Id.* at ——, 114 S.Ct. at 2457.

The *Turner* Court held that strict scrutiny—termed by the Court "exacting" or "rigorous" scrutiny—applies to content-based cable regulations and that intermediate scrutiny applies to content-neutral cable regulations.[22]

---

22. In *Denver Area,* —— U.S. at ——, 116 S.Ct. at 2374, which involved a challenge to three provisions of the Cable Television Consumer Protection and Competition Act of 1992 regulating "patently offensive" material on leased access and public access cable channels, a plurality of the Court suggested that the Court's rejection of the broadcast analogy in *Turner* was triggered by the specific facts of *Turner,* and that the distinction was not necessarily applicable to the facts at issue in *Denver Area. See id.* at ——, 116 S.Ct. at 2388 ("While that distinction was relevant in *Turner* ... it has little to do with a case that involves the effects of television viewing on chil-

dren."). While the plurality distinguished *Turner*'s reasoning, it nevertheless declined to adopt the broadcast cases as a wholesale analogy applicable to cable regulation, *see id.* at ——, 116 S.Ct. at 2385, or the specific standard of scrutiny applied in the broadcast cases, although it did rely on one broadcast case, *FCC v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), in the development of its analysis.

Justice Kennedy's *Denver Area* opinion, in which Justice Ginsburg joined, states flatly that "strict scrutiny is the baseline rule for reviewing any content-based discrimination against

Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

*Id.* at ——, 114 S.Ct. at 2459. *See also Bery,* 97 F.3d at 696–97.

The Court acknowledged that "[d]eciding whether a particular regulation is content-based or content-neutral is not always a simple task." *Turner,* 512 U.S. at ——, 114 S.Ct. at 2459. In making this determination, the Court held that

> [a]s general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based. By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral.

*Id.* at ——, 114 S.Ct. at 2459.

Several of the First Amendment principles addressed in *Turner* have been discussed more fully outside the context of cable regulation. Even though a Court must draw from other areas of First Amendment jurisprudence with care, since the cable industry involves unique First Amendment concerns, *see Denver Area,* —— U.S. at ——, 116 S.Ct. at 2385, these cases nonetheless provide guidance in navigating the constitutional implications of this relatively new medium.

As *Turner* itself reaffirmed, speakers have a First Amendment right not to be compelled to speak by the government. *See Turner,* 512 U.S. at ——, 114 S.Ct. at 2459 ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to ... rigorous scrutiny."). In *The Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 256, 94 S.Ct. 2831, 2838–39, 41 L.Ed.2d 730 (1974),[23] the Court held that where the government forces a newspaper to carry speech that it otherwise would not want to carry, the First Amendment is violated to the same extent as when the government directly prohibits speech.[24] *See also Riley v. National Fed. of the Blind of N.C., Inc.,* 487 U.S. 781, 795, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988) (holding that "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech.");[25] *Pacific Gas & Elec. Co. v. Public Utilities Comm'n,* 475 U.S. 1, 15, 106 S.Ct. 903, 911, 89 L.Ed.2d 1 (1986) (plurality opinion) (re-

speech." *Id.* at ——, 116 S.Ct. at 2413 (Kennedy, J. concurring in part and dissenting in part). Because of the clearly content-based actions of the City in this case, I find that *Turner's* dichotomy between content-based and content-neutral regulation of cable programming, rather than the broadcast analogy, is the proper analytical framework in the present context.

23. In *Tornillo* the Court struck down a Florida statute which required newspapers that print editorials critical of a candidate for elective office to print that candidate's response to the editorial.

24. While the Court in *Turner* noted that government action that "requires the utterance of a particular message favored by the Government" violates First Amendment principles, *Turner,* 512 U.S. at ——, 114 S.Ct. at 2458, the Court distinguished *Tornillo* and held that its strict scrutiny analysis was not appropriate in the context of the must-carry provisions. The Court gave three reasons for this holding. First, the Court noted that the must carry requirements were content-

neutral. *Id.* at ——, 114 S.Ct. at 2465. Second, the Court stated that the must carry rules would not force cable operators "to alter their own messages to respond to the broadcast programming they are required to carry." *Id.* Finally, the Court held that due to technological differences between the newspaper and cable industries, *Tornillo* was not an appropriate analogy. As in *Turner, Tornillo* does not directly control this case. It does, however, provide important guidance for the situation with which this Court is presented—namely, content-based decision-making by the City that compels unwanted speech.

25. In *Riley* the Court struck down a statute which required a professional fundraiser to disclose to potential donors the percentage of charitable contributions collected during the fundraiser's prior twelve months that were actually turned over to the charities.

jecting regulation in part because it "identifi[ed] a favored speaker" based on the content of that speaker's speech, "and force[d] the speaker's opponent ... to assist in disseminating the speaker's message. Such a requirement necessarily burdens the expression of the disfavored speaker.").[26]

A second guiding principle, also discussed in *Turner*, is that the government regulation of speech based on its content is subject to strict scrutiny. For example, in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), the Court struck down an Arkansas sales tax exemption that applied only to newspapers and "religious, professional, trade and sports" magazines or journals. The Court held that "[s]uch official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press." *Id.* at 230, 107 S.Ct. at 1728.

Significantly, the Court held that "Arkansas' system of selective taxation does not evade the strictures of the First Amendment merely because it does not burden the expression of particular views by specific magazines." *Id.* The Court held that

Arkansas faces a heavy burden in attempting to defend its content-based approach to taxation of magazines. In order to justify such differential taxation, the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.

*Id.* at 231, 107 S.Ct. at 1729. The Court found that the regulation failed this strict scrutiny test. *See also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) ("The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid."); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (holding that "above all else, the First Amendment means that government has no power to restrict

expression because of its message, its ideas, its subject matter, or its content").

A final principle of importance to this case is that viewpoint-based discrimination—as opposed merely to content-based discrimination—is particularly unacceptable under the First Amendment. For example, in *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, —— U.S. ——, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Supreme Court struck down a University regulation which denied funding to a Christian newspaper based on the religious content of that newspaper. The Court held that the student activity fund was a limited public forum and that the University's actions violated the Christian group's First Amendment rights because the University discriminated based on viewpoint.

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.... In the realm of private speech or expression, government regulation may not favor one speaker over another. Discrimination against speech because of its message is presumed to be unconstitutional.

*Rosenberger*, —— U.S. at ——, 115 S.Ct. at 2516. Moreover, as the Court recognized, discrimination based on the viewpoint of a speaker is the most pernicious type of government interference with speech.

When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

*Rosenberger*, —— U.S. at ——, 115 S.Ct. at 2516. *See also R.A.V.*, 505 U.S. at 391–92, 112 S.Ct. at 2548 (holding that the City "has no such authority to license one side of a debate to fight freestyle, while requiring the

---

**26.** In *Pacific Gas* the Supreme Court struck down a public utilities commission order that a utility permit a third party to use space in the

utility's newsletter—a newsletter that would then be distributed by the utility in its billing envelopes.

other to follow Marquis of Queensberry rules").

## 2. *Applying the First Amendment*

Time Warner contends that its First Amendment rights have been violated in two ways, each of which constitutes irreparable harm.[27] First, Time Warner claims that it has First Amendment rights in the City's PEG channels. Time Warner argues that when the City placed programming on Crosswalks which was inappropriate for a PEG channel, the City lost the right to use that PEG channel, and the right "reverted" to Time Warner.[28] Therefore, Time Warner argues, when the City placed on that channel programming which Time Warner did not wish to carry, the City forced Time Warner to speak in violation of the First Amendment. Second, Time Warner argues that the City's actions in this case—including placing BIT and preparing to place Fox News on Crosswalks—are intended to compel Time Warner to reverse its initial decision and accept Fox News on its regular commercial channels. This argument is based on Time Warner's First Amendment rights in the commercial channels under its control.[29] I will address both of these theories in turn.

### a. *Time Warner's First Amendment Rights in the PEG Channels*

■] The central issue in determining whether Time Warner has First Amendment rights in the City's PEG channels is essentially a "chicken and the egg" problem. On the one hand, Time Warner argues that it has an underlying right to all of the channels. Time Warner contends that because the City's right to use certain channels comes only from either Section 531(a) of the statute or the franchise agreements, once the City is violating that right, the channels revert to Time Warner. Under this analysis, because the City is using Crosswalks for non-PEG purposes, Time Warner has regained its right to use the channels; and prior to the entry of the TRO, Time Warner was compelled by the City to carry speech that it did not want to carry, in violation of the First Amendment.[30] In contrast, the City argues that no one owned the channels first, and that Time Warner's only right to any channels arises from the franchise agreements. If this is true, then Time Warner has no reversionary right to the PEG channels because it never had a right to use them in the first place.

■ Time Warner finds support for its argument in Section 531(d) of the Act, which requires a franchising authority to prescribe

> (1) rules and procedures under which the cable operator is permitted to use [PEG] channel capacity for the provision of other services if such channel capacity is not being used for the purposes designated, and (2) rules and procedures under which such permitted use shall cease.

47 U.S.C. § 531(d). The legislative history explains that this provision applies to channels that are "dark"—or "fallow" in the jar-

---

**27.** It is arguable that the City's actions in placing BIT and preparing to place Fox News on Crosswalks constituted retaliation for Time Warner's constitutionally-protected editorial decision to refuse to carry Fox News. *See Mt. Healthy City Sch.Dist.Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Although Time Warner pleaded a factual basis for a retaliation claim, and presented evidence at the hearing addressed to such a claim, it did not plead a cause of action for retaliation. Therefore, I decline to decide whether the City's actions constitute impermissible retaliation except insofar as such an analysis is relevant to deciding whether the City has also acted to compel Time Warner to alter its editorial decision.

**28.** At the hearing on the preliminary injunction, the Court referred to this argument as the "reversion theory." Counsel for Time Warner prefers to call this theory the "continuing rights theory."

**29.** At the hearing, the Court referred to this argument as the "coercion theory."

**30.** At the hearing on Time Warner's TRO application on October 11, 1996, the City conceded that if the PEG provisions were being violated, Time Warner's First Amendment rights were being violated. The City has changed its position, and now argues that because Time Warner has no right to the PEG channels, it has no right to complain if the City places Fox News and BIT in its channels.

gon of New York City's regulatory scheme.[31] And indeed, the franchise agreements here have procedures for the use of channels which are fallow.[32] Section 531(d), however, stands for little more than that unused channel capacity should be used by someone. As the legislative history also explains, Congress intended that any PEG-designated channel which had been fallow be returned to the franchise authority for its use as quickly as possible when PEG programming becomes available for it.[33]

A second statutory provision supporting Time Warner's contention is Section 531(a), which states that the City "may establish requirements in a franchise with respect to the designation or use of channel capacity for public, educational, or governmental use *only to the extent provided in this section.*" 47 U.S.C. § 531(a) (emphasis supplied). By only allowing the City to set aside PEG channels "to the extent provided in this section," Time Warner argues that unless the City is in compliance with the requirements of Section 531, it may *not* use the channels.

■ While Section 531(a) describes the proper use of a PEG channel, it does not establish an underlying right of a cable operator to such channels. To the contrary, as noted above, prior to the enactment of the Cable Act, franchising authorities throughout the country—including in New York City— were requiring as a condition of granting the

franchise that cable operators set aside PEG channels for the use of the franchising authorities. *See Time Warner,* 93 F.3d at 972. Thus, the City may be violating the PEG provision of Section 531(a), but it does not necessarily follow that the right to the channel reverts automatically to Time Warner.

■ The best reading of the statutory framework is that the answer to who owned the channels first is neither party—the rights to the channels were created simultaneously at the time the franchise agreements were signed. Without the franchise agreements, neither the City nor the cable operator would have a right to use any channel. As explained by Justice Kennedy in his *Denver Area* concurrence/dissent,

> the editorial discretion of a cable operator is a function of the cable franchise it receives from local government. The operator's right to exercise any editorial discretion over cable service disappears if its franchise is terminated.... The cable operator may own the cables transmitting the signal, but it is the franchise—the agreement between the cable operator and the local government—that allocates some channels to the full discretion of the cable operator while reserving others for public access.

*Denver Area,* —— U.S. at ——, 116 S.Ct. at 2410.

---

**31.** The House Report stated that when PEG channel capacity is not being used,

> the needs and interests of cable subscribers would be better served by allowing unused PEG channel capacity to be used by the operator for the provision of other cable services, rather than those channels remaining 'dark' until use of this channel capacity for PEG purposes increases. Section 611(d), which applies to all existing and future franchises, provides for the use, under these circumstances, of channel capacity designated for PEG purposes, and directs the franchising authority to prescribe rules and procedures for the use of unused PEG channel capacity by the cable operator.

H.R.Rep. No. 98–549, *supra,* at 47, *reprinted in* 1984 U.S.C.C.A.N. at 4684.

**32.** For example, Section 4.1.06 of the 1990 Agreement permits Time Warner to request that the City allow it to use any "unused" channel time on the PEG channels. Before Time Warner can request access to the unused channel, the

channel must have been unused for ninety days. After a request in writing, Time Warner can begin using the channel within thirty days, unless, within that time, the City notifies Time Warner that it does not consent to Time Warner's use of the channel. In addition, once Time Warner begins using the channel, the City, in its discretion, can require Time Warner to give the channel back.

**33.** The House Report states that

> The Committee notes that where demand for use of such channel capacity for [PEG] purposes develops, subsection 611(d) is not intended to frustrate use of these channels for those purposes. Accordingly, the franchising authority is further directed to develop rules to assure that when there is appropriate demand for use of those channels designated for PEG purposes, cable operator use of those channels ceases.

H.R.Rep. No. 98–549, *supra,* at 47, *reprinted in,* 1984 U.S.C.C.A.N. at 4684.

Accordingly, I find that even though the City is misusing the PEG channels, Time Warner has no First Amendment right to editorial discretion over channels that it never had a right to use. *See id.* at ——, 116 S.Ct. at 2394 (observing that the statute at issue in *Denver Area* "does not restore to cable operators editorial rights that they once had, and the countervailing First Amendment interest is nonexistent, or at least much diminished"). Accordingly, Time Warner's argument based on its underlying First Amendment interest in the PEG channels must fail.

b. *Time Warner's First Amendment Rights in the Commercial Channels*

In order to determine if Time Warner is entitled to a preliminary injunction, I must decide if it has shown irreparable harm. This requires proof that Time Warner has a First Amendment interest that is being injured by the City's actions. Next, I must determine whether Time Warner has shown a likelihood that it will succeed in proving that the City violated this First Amendment interest. This requires that I determine what standard of First Amendment scrutiny is applicable here, and whether the City's actions pass that test. I will address the two parts of the preliminary injunction standard in turn.

i. *Irreparable Harm*

■ Time Warner contends that by engaging in a pattern of conduct for the purpose, and with the effect, of forcing Time Warner to carry Fox News on its commercial channels, the City has violated Time Warner's First Amendment right as a cable operator to exercise editorial discretion. The City does not contest that Time Warner has a First Amendment right to the independence of its programming decisions over the commercial channels. It contends, however, that it has not interfered with that right.

The City's first argument is that it acted for legitimate purposes unrelated to an attempt to influence Time Warner's editorial

discretion. The City asserts essentially two interests to justify its actions in this case:

(i) the expansion of the diversity of voices contributing live news, information and public affairs programming on New York City-franchised cable systems; [34] and (ii) the promotion of economic development and employment opportunities by supporting the availability of New York City-produced news, information, and public affairs programming.

I find that the City's justifications for its actions in this case are entirely unconvincing. As discussed above, I find that a substantial and motivating factor in the City's decision to place Fox News and BIT on Crosswalks was the desire to compel Time Warner to accede to the City's request that Fox News be placed on Time Warner's system of commercial channels. I reject the City's contention that after Time Warner said "no" to its October 1 "swap" proposal, the City no longer wished to place Fox News on a commercial channel, but merely wanted a waiver so that it could be placed on Crosswalks. Among other evidence, the City's assertion is belied by the October 10 Ailes letter, which indicates that both Fox and the City continued to share the goal of Fox News being on one of Time Warner's commercial channels. The letter stated that

[w]e share the City's view that this approach is, at best, a temporary arrangement, and we would not commit to providing the [Fox News] signal on a commercial-free basis beyond December 31, 1996. We certainly hope that, well before that date, Time Warner will agree to fulfill its previous commitment to carry [Fox News] on its system.

As this letter reveals, the City was well aware that Fox was only willing to be on Crosswalks without commercials for a limited time, and it continued to be both Fox's and the City's goal that Fox News be placed on one of Time Warner's commercial channels in the very near future.

---

**34.** The City has also endeavored to justify its actions by referring to its concern about Time Warner's alleged anticompetitive behavior. This justification is related to the City's concern with diversity of programming, and thus these two City purposes will be considered together.

Moreover, taking both of the City's proffered justifications in turn, I find that Time Warner has established a likelihood that it will succeed in proving that each of these reasons is pretextual. And, even if Time Warner had not made such a showing, importing and applying to the City's justifications an analysis under *Mt. Healthy,* I find that the City has not carried its burden of establishing that it would have taken the steps it did even in the absence of the constitutionally impermissible motive I have found it had. *See Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996).

With respect to the City's purported desire to increase the diversity of news programs available to New Yorkers, it must be observed as an initial matter that it is not self evident that this is in fact a constitutionally permissible purpose when the City has favored specific speakers in pursuit of this goal. In any event, the City has offered no evidence in support of its contention that there is insufficient news programming in New York City, that there is insufficient "diversity" in that programming, or that it has had any concern regarding this issue other than in response to the Ailes' request for assistance. Nor, of course, did the City, before placing BIT on Crosswalks, devise a content-neutral procedure to give news and public affairs programming excluded from Time Warner's commercial channels access to Crosswalks.

Given this record, the conclusion is inescapable that the City's intonation of the rubric "diversity" is a thinly disguised reference to its preference for the editorial content of Fox News. As such, this rationale for the City's actions cannot constitute a permissible purpose for its actions.[35]

The City's second justification fares no better. While the economic health of a city and the preservation and creation of jobs is an appropriate and essential concern of city government, the record here does not indicate that this concern was other than pretextual in the context of this dispute.

It is not disputed that this Mayor has made job retention and creation a priority of his administration and that the City negotiated an agreement with Fox in line with those goals. There is no persuasive evidence in the record, however, that any existing or projected jobs at Fox are endangered by its failure to be carried on cable channels in New York City. To the contrary, Fox claimed that the entry of its twenty-four hour news channel onto the national market this fall was an unparalleled success. In contrast, the record reflects only doomsday predictions from Fox and varying figures of lost jobs proffered by the City without any reasoned basis. Finally, the pretextual nature of this justification is underscored by the facts that the City never chose to put programs onto Crosswalks to save a programmer's job until Ailes called on behalf of Fox News, and after Ailes' call the City did not study how the greatest number of such jobs could be so saved or created. Instead, Fox News and BIT were given a benefit unavailable to other New York City-based companies for whose programs Time Warner has not found space on its New York City cable channels.

The City next argues that, whatever the City's intentions, carrying Fox News and

---

**35.** For similar reasons I reject the City's suggestion that it was concerned about anticompetitive behavior by Time Warner. Although DoITT could have raised concerns about any anticompetitive effect of the merger, or about any inappropriate manner in which Time Warner wielded its bottleneck monopoly power in making programming decisions at any time during the summer of 1996, it did not do so. Moreover, Time Warner's programming did not change after October 1, 1996. It was no more or less reflective of any antitrust problem after October 1 than before. What did change was Fox's call to the Mayor, raising the antitrust issue, and Time War-

ner's rejection of the City's proposals. While the City insists that Time Warner did not respond sufficiently to Fox's charges to put the issues raised by Fox to bed, the record reveals that these concerns regarding anticompetitive behavior were not addressed by DoITT in a manner at all similar to the way in which DoITT addressed other issues of concern. Instead, the record supports the inference that the issue of the anticompetitive nature of Time Warner's programming decisions was, again, simply another way of expressing the City's disappointment that Fox had not been chosen by Time Warner.

BIT on the City's PEG channels has no actual impact on Time Warner's independent exercise of its programming decisions. This argument has taken several forms; one of which is that Time Warner has no "standing" to make its claim because it has no First Amendment interest at stake. This argument raises the closest issue in this case. On balance, however, I am persuaded that Time Warner has carried its burden and established the necessary link between the City's actions and their impact on Time Warner's decisionmaking.

First, the powerful evidence that the City took the steps it did with the intention and, I find, belief that they would impact Time Warner's decisionmaking is in itself probative evidence that its acts will achieve their intended effect. The City's considerable efforts to influence Time Warner's editorial discretion did not suddenly cease on October 10, 1996, when it placed BIT on Crosswalks. Rather, the City's decision to place the two news programs on Crosswalks is best seen and can only properly be understood as part of its continuing effort, through means fair and foul, to prevail upon Time Warner to carry Fox News on one of its commercial channels.

Second, I find that Fox News and BIT also expect that placement on Crosswalks will significantly increase their ability to win places on Time Warner's commercial channels. The evidence is unrebutted that Fox News has no long term interest in being on Crosswalks, that it does not wish to run without advertising, and that it refused even to make a commitment to the City to run on Crosswalks without advertising past December 31 of this year.

While BIT's posture is more complicated, its long-term goals are identical to Fox's. BIT wants to be on a commercial channel, supported by advertising, and believes that a period of time on Crosswalks will appreciably increase its likelihood of achieving those goals. In contrast to Fox News, BIT is willing to make a longer-term commitment to running without advertising on Crosswalks, principally for two reasons. Since the identity of the Bloomberg enterprises is uniquely tied to financial and market news, it is partic-

ularly important that BIT be available as a twenty-four hour news service in New York City, the financial center of the country. Because of the benefits which will accrue more generally to Bloomberg from such exposure in New York City, it is prepared to be more patient than Fox. It also appears from the BIT format that its costs to run an advertising-free program with a component of some local news will be substantially less than for more traditional news programs. And thus, it will also be less expensive for BIT during the period it runs on Crosswalks.

In sum, as is true with the City, there is strong evidence that Fox and Bloomberg believe that placement of their news programs on Crosswalks will have the effect of causing Time Warner to place the programs on one of its commercial channels. Such evidence is additional proof that the City's decision to place them on a PEG channel will achieve that goal.

The dynamics of the cable industry explain why the City's actions will have the effect of forcing Time Warner to alter its editorial decision not to carry Fox. Given the way cable consumers react to programming decisions, placing Fox News even temporarily on the Crosswalks channels will create pressure for Time Warner to accept Fox News on one of its commercial channels. Stuart J. Lipson, an independent consultant on cable television programming, testified that

> [c]able carriage of virtually any programming service tends to build some degree of viewership and viewer loyalty. Once a service is added to a cable system, resistance to the removal of that service is certain to be encountered.

Thus, by playing on the Crosswalks channels, Fox News will build viewer loyalty and, when it threatens to leave Crosswalks due to the absence of advertising revenue—it currently expects to leave by December 31—it will leave Time Warner with the choice of carrying Fox News on its commercial channels or angering viewers.

Moreover, by placing BIT and preparing to place Fox News on Crosswalks, the City has fundamentally changed the incentives for Time Warner in making its editorial decision

about whether or not to accept Fox News on one of its commercial channels. In any negotiations, Fox and Bloomberg can claim that they have alternative market access—therefore, they need not pay the premium which is ordinarily required to gain access. This change in the bargaining positions of the parties undoubtedly will affect Time Warner's decisionmaking about whether or not to grant channel space to Fox News or BIT, and on what terms.

In addition, the City's actions create a chilling effect under which Time Warner will feel pressure to capitulate to City requests that it accommodate a New York City commercial programmer who has direct access to the City Hall. In such cases, if Time Warner refuses the City's request, then the City can simply turn Crosswalks into a competing commercial system of channels.[36]

Finally, on any cable system, the relevant universe from the perspective of the viewer is the total mix of programming on the system. In order to respond to what the consumer wants, Time Warner considers the programming on the cable system as a whole—including what is on the leased access channels, the must-carry broadcast stations, as well as the PEG channels—when exercising its editorial discretion about what to place on its commercial channels. Thus, insofar as the City is placing programming on Crosswalks which does not belong there, the City's decision is affecting the total mix of channels, and thereby affecting Time Warner's editorial discretion.[37] Of course, any time the City makes a programming decision about its PEG channels it is affecting the "total mix" of programming. Therefore,

making programming choices alone which affect the total mix of what is on cable is not what is inappropriate here. What the City cannot do is select a particular program to place on Crosswalks that does not belong on a PEG channel, with the specific purpose of overriding Time Warner's editorial discretion by forcing Time Warner to alter its editorial decision.

▬ In sum, Time Warner has a right under the First Amendment to be free from government interference with its programming decisions. I find that the City, through its course of conduct, culminating in its decision to place Fox News and BIT on Crosswalks, has acted to compel Time Warner to add Fox News to its system of commercial channels and that these actions have had a direct, immediate, and chilling effect on Time Warner's exercise of its constitutionally-protected editorial discretion. Consequently, Time Warner has carried its burden of establishing irreparable harm. *Cf. Shea on Behalf of Am. Reporter*, 930 F.Supp. at 935.

ii. *Likelihood of Success*

I now turn to whether Time Warner has established a likelihood that it will succeed in proving a violation of the First Amendment. In order to make this determination, I must first address the level of First Amendment scrutiny applicable to this case.

(a) *Level of Scrutiny*

▬ *Turner* holds that content-neutral cable regulations are subject to intermediate scrutiny, and that content-based regulations are subject to strict scrutiny. *See*

---

**36.** It could be argued that there are advantages to a system that allowed a City to use its channel capacity to compete with the cable operator in the commercial programming field and thereby lessen the monopoly power of the operator. There is, in fact, no bar to a City establishing or allowing competing cable systems to operate within its boundaries. Using the PEG channels for this purpose, however, is at odds with the structure established by the Cable Act and violates both Section 544(f)(1) and the First Amendment insofar as such power is used to curb an operator's freedom of decisionmaking over its commercial channels. If the City believes that Time Warner has abused its monopoly power in making programming decisions on the forty-one to forty-three or so channels in the system for

which it makes such decisions, then the City has appropriate remedies to pursue. Placing Fox News and BIT on Crosswalks is not among those remedies.

**37.** This argument is not intended to suggest that Time Warner has any right of editorial control over the City's PEG channels—as discussed above, Time Warner has no such right. The fact that Time Warner considers the total mix of programming when making its choices merely illustrates how the City's wrongful actions in misusing the PEG channels has an impact on Time Warner's editorial decisionmaking over its commercial channels.

*Turner,* 512 U.S. at ——, 114 S.Ct. at 2459. Therefore, the key issue in determining what level of scrutiny to apply is whether the City's decision to place BIT and Fox News on its PEG channels was content-based or content-neutral.

▆▆ In determining whether a government action is content-neutral or content-based, a court should consider the government's purpose in taking the action. *See Turner,* 512 U.S. at ——, 114 S.Ct. at 2459. The City's purpose in acting to compel Time Warner to give Fox one of its commercial channels was to reward a friend and to further a particular viewpoint. As a consequence, Fox was the recipient of special advocacy. The very fact that the City chose Fox News out of all other news programs— not to mention the significant number of other programs which have been denied space on Time Warner's commercial network—is by itself substantial evidence that the City chose Fox News based on its content. As I have noted above, I find that BIT was admitted to Crosswalks as "cover" for the City's blatant content-based choice of Fox News.

It is clear that the City did not act here pursuant to any procedure for ascertaining the programming needs of the community based on content-neutral criteria unrelated to viewpoint or the identity of the owner of the proposed program. There was no study to determine how best to utilize the Crosswalks channels to further any of the City's purported goals—fuller employment, programming diversity, or reducing anticompetitive conduct. The City's actions represent just the type of viewpoint-based decisionmaking that the First Amendment forbids.

Indeed, illustrating the viewpoint-based nature of the City's actions, the City has argued in its brief that one of its purposes in adding Fox News and BIT to Crosswalks was to expand the "diversity of voices contributing live news" on New York's cable systems. It is not, however, permissible for the City to determine what viewpoints are not adequately represented, and then to remedy that underrepresentation by choosing who should be given access to Time Warner's commercial cable system.[38] *Cf. Rosenberger,* —— U.S. at ——, 115 S.Ct. at 2516 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

▆▆ In addition, I find that the City acted to punish Time Warner for exercising its editorial discretion to refuse Fox News. This punishment included placing BIT and preparing to place Fox News on Crosswalks, and linking Time Warner's decision about whether to carry Fox News on its commercial channels to both the City's approval of the Time Warner/Turner merger and to Time Warner's franchise renewal in 1998. This finding also demonstrates that the City was making a content-based decision about what news should be placed on the cable system. If the City were not engaged in content-based favoritism, it would not have found it necessary to undertake such a significant effort to punish Time Warner for its decision. As stated in the leading treatise on cable law—a treatise cited by both parties:

> Of course, if there is specific proof that any regulation is actually being used to punish an operator for a discretionary programming decision, the governmental action should be viewed as content-based.

Brenner et al., *supra,* § 6.03[2][c], at 6–26.

Finally, I should note that while the *Turner* Court's primary consideration for determining the appropriate level of scrutiny was whether the regulation was content-based or content-neutral, the Court also rejected using *Tornillo*'s strict scrutiny rule in part because of the government's need to protect against anticompetitive behavior by cable operators. The Court stated that

> [w]hen an individual subscribes to cable, the physical connection between the televi-

---

**38.** This same type of analysis was used by the Supreme Court in *Mosley,* where the Court stated that

> government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities.

*Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290.

sion set and the cable network gives the cable operator bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home. Hence, simply by virtue of its ownership of the essential pathway for cable speech, a cable operator can prevent its subscribers from obtaining access to programming it chooses to exclude. A cable operator, unlike speakers in other media, can thus silence the voice of competing speakers with a mere flick of the switch.

The potential for abuse of this private power over a central avenue of communication cannot be overlooked. The First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas.

*Turner,* 512 U.S. at ——, 114 S.Ct. at 2466. While this rationale was part of the *Turner* Court's decision to apply intermediate scrutiny, the Court made clear that it was doing so because

> the must-carry provisions are not structured in a manner that carries an inherent risk of undermining First Amendment interests. The regulations are broad-based, applying to almost all cable systems in the country, rather than just a select few. As a result, the provisions do not pose the same dangers of suppression and manipulation [as other cases applying strict scrutiny]. For these reasons, the must-carry rules do not call for strict scrutiny.

*Id.* at ——, 114 S.Ct. at 2468.

The regulations at issue in *Turner* were content-neutral structural regulations designed to save the broadcast networks. The City's actions in this case are very different, and thus warrant strict scrutiny. First, the City's actions are viewpoint based, which *Turner* makes clear require strict scrutiny. Second, the City's actions are not the type of broad-based "structural" regulations faced by the *Turner* Court, but rather are specifically targeted to benefit two individual speakers. Finally, the City has not engaged in any fact

finding, as did Congress in justifying the "must-carry" rules.

Therefore, while I acknowledge that the potential misuse of "bottleneck" market power is implicated in this case, the response of the City was simply inappropriate. To remedy potential antitrust violations by Time Warner, the City has many options—attempting to compel Time Warner to carry a competitor through coercive actions in violation of Time Warner's constitutionally-protected editorial discretion is not one of them. Accordingly, given the evidence here of content-based decisionmaking by the City, I find that strict scrutiny applies.

#### (b) *Applying Strict Scrutiny*

In *Sable Communications v. FCC,* 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Supreme Court described the strict scrutiny standard as follows:

> The Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.... The Government may serve this legitimate interest, but to withstand constitutional scrutiny, "it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends.

*Id.* at 126, 109 S.Ct. at 2836–37 (citations omitted). Essentially, there must be (1) a compelling governmental interest; and (2) the means chosen to accomplish that interest must be narrowly tailored to that end. In undertaking this analysis, the Court may consider the alternative means available to the government of accomplishing the same goals. *Id.*

As noted above, the City argues that it was acting to further two interests: to ensure a wide diversity of programming, and to promote city employment. I have found that these reasons have been used here as pretexts and were not the actual motivation for the City's actions. Even if the City had

been motivated by these reasons, however, and even if they are compelling, I find that the City has not narrowly tailored its actions to accomplish these goals.

■ The City has simply failed to show that placing Fox News and BIT on the Crosswalks channels is necessary in order to further the goals of increasing the diversity of news programs or promoting City employment. In addition, there are several alternative methods by which the City could have accomplished these same goals without threatening Time Warner's First Amendment right to exercise editorial discretion over its commercial channels. For example, to protect New York City media jobs, the City could have assisted City-based media companies in any number of ways including granting tax breaks. To promote diversity of programming, the City could have negotiated a modified franchise agreement to add another franchisee to the New York area. Similarly, if the City felt that Time Warner's monopoly position was preventing needed diversity of news programming, it could have recommended an antitrust investigation of Time Warner. These alternatives would have accomplished the City's goals without intruding on Time Warner's First Amendment rights.[39]

■ I must address one last issue. The City argues that its First Amendment right to speak would be infringed by the issuance of a preliminary injunction in this matter. In addition, as noted above, under Section 531(e) Time Warner may not interfere with the City's programming decisions for the PEG channels. Fox and Bloomberg also assert that they have First Amendment interests which would be injured if this Court issues an injunction. According to the City, Fox, and Bloomberg, an injunction would act as a prior restraint on their speech.

I acknowledge the complex nature of the competing First Amendment interests at stake here. Fox and Bloomberg as cable programmers clearly have a First Amendment right to speak. The public has a First Amendment interest in a wide range of information. Moreover, the City has a statutory right—and, it argues, a First Amendment right—to determine what programming to place on its PEG channels. I need not decide, however, whether municipalities have First Amendment rights, because I find that even assuming the City does have such rights, and despite the unquestioned existence of the rights of Fox and Bloomberg, this argument must fail.

The City cannot wield its own First Amendment right as a sword to force Time Warner to capitulate to the City's demands, and then claim that same First Amendment right as a shield preventing this Court from granting relief. As to the First Amendment rights of Fox and Bloomberg, their deprivation is due to the City's violation of its First Amendment obligations as a state actor, and thus is incidental. As discussed above, the City had no right under the Cable Act or the franchise agreements to place their programs on Crosswalks in the first instance.

In sum, the City's actions fail strict scrutiny. Accordingly, I find that Time Warner has shown a likelihood of success on the merits of its claim that the City has violated

---

**39.** While I hold that the City's actions are subject to strict scrutiny, I find that they would fail even under intermediate scrutiny. Under the *O'Brien* test, a regulation will be upheld if

it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). *See also Ward v. Rock Against Racism,* 491 U.S. 781, 798–800, 109 S.Ct. 2746, 2757–59, 105 L.Ed.2d 661 (1989). The regulation "need not be the least restrictive or least intrusive means of doing so." *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757–58. "Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner,* 512 U.S. at ——, 114 S.Ct. at 2469 (quoting *Ward*).

Here, viewpoint favoritism and speaker preference, which were the City's true motivations, can hardly be characterized as legitimate government purposes, "unrelated to the suppression of free expression." *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. In addition, for the reasons the City's actions fail strict scrutiny, they also fail intermediate scrutiny.

its First Amendment right to exercise editorial discretion.

### IV. *Conclusion*

The City has engaged in a pattern of conduct with the purpose of compelling Time Warner to alter its constitutionally-protected editorial decision not to carry Fox News. The City's actions violate longstanding First Amendment principles that are the foundation of our democracy. As the Court stated in *Turner:*

> At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal. Government action that ... requires the utterance of a particular message favored by the Government, contravenes this essential right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to ... manipulate the public debate through coercion rather than persuasion.

*Turner*, 512 U.S. at ——, 114 S.Ct. at 2458.

In many instances the First Amendment has been invoked to protect the interests of those whose ideas are unpopular or even repugnant. Here the First Amendment is invoked by a powerful commercial enterprise with substantial resources to respond to the government's actions. Even though the government's power is nearly matched by that of its commercial adversary, in order to protect the values embodied in the First Amendment, we nevertheless must be vigilant against the abuse of governmental power present here.

Having found that Time Warner has carried the burden that applies at this preliminary proceeding and that it has sufficiently established that the City of New York violated Time Warner's rights under Section 544(f)(1) of the Cable Act and under the First Amendment of the United States Constitution, I preliminarily enjoin the City from placing Fox News and BIT on its Crosswalks channels in a manner inconsistent with this Opinion. Time Warner shall submit a proposed order on notice within seven days.

SO ORDERED.